IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                                )
KRISTINA MARTINEZ, as Personal  )
Representative of the ESTATE    )
OF DALE RAND ERICKSON,          )
deceased, LUCILLE HIGGINS,      )
BRANDON ERICKSON, MATTHEW       )
ERICKSON, JONATHAN ERICKSON,    )
and BRIANNA ERICKSON,           )   No. 1:22-CV-00288-WJ-SCY
                                )
        Plaintiffs,             )
                                )   Domenici U.S. Courthouse
    vs.                         )   Cimarron Courtroom
                                )   Albuquerque, New Mexico
CORRHEALTH, PROFESSIONAL        )   Tuesday, December 10, 2024
LIMITED LIABILITY COMPANY       )
d/b/a CORRHEALTH, LLC., et al. )
                                )
        Defendants.             )
_____)

TRANSCRIPT OF PROCEEDINGS
ORDER TO SHOW CAUSE HEARING
BEFORE THE HONORABLE WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs          ARNE LEONARD, ESQ.
Higgins and Martinez:       CAREY BHALLA, ESQ.
                            ALEJANDRO ALVARADO, ESQ.
                            MARC LOWRY, ESQ.
                            ROTHSTEIN DONATELLI, LLP
                            500 Fourth Street, N.W.
                            Suite 400
                            Albuquerque, New Mexico 87102

For the Plaintiffs          SAM P. RUYLE, ESQ.
Erickson:                   CLARK & RUYLE LAW FIRM
                            432 Galisteo Street
                            Santa Fe, New Mexico 87501

APPEARANCES (Continued):

For the Defendants            ALEXANDRA AH LOY, ESQ.
and Hall Booth Smith:         JASON HENDREN, ESQ.
                              HALL BOOTH SMITH
                              6301 Waterford Boulevard
                              Suite 200
                              Oklahoma City, Oklahoma 73118

For the Defendant             MICHELLE LALLEY BLAKE, ESQ.
CorrHealth, LLC:              ALLEN LAW FIRM, LLC
                              6121 Indian School Road, N.E.
                              Suite 230
                              Albuquerque, New Mexico  87109

For the Individual            BRYAN CHANCE HOLLAND, ESQ.
Defendants and HBS:           HALL BOOTH SMITH
                              6301 Waterford Boulevard
                              Suite 200
                              Oklahoma City, Oklahoma 73118

For the Defendant             CHANCE A. BARNETT, ESQ.
Dr. Bruce Boynton:            KREHBIEL & BARNETT, P.C.
                              6330 Riverside Plaza Lane, N.W.
                              Suite 205
                              Albuquerque, New Mexico 87120

For the Defendant             CHRISTINA BRENNAN, ESQ.
Barry Stanford:               SERPE ANDREWS, PLLC
                              4001 Office Court Drive
                              Suite 203
                              Santa Fe, New Mexico 87507

For the Defendant             CARLA WILLIAMS, ESQ.
Oakley Blasdel:               ATWOOD, MALONE, TURNER & SABIN, P.A.
                              400 North Pennsylvania
                              Suite 1100
                              Roswell, New Mexico  88202

For the Defendant             SCOTT SWEENEY, ESQ.
Kimberly Rich-Gainey:         WILSON ELSER
                              1225 17th Street, Suite 1700
                              Denver, Colorado 80202

For the Defendant             MATTHEW RAPPAPORT, ESQ.
Myra Martinez:                MILLER STRATVERT LAW FIRM, P.A.
                              500 Marquette Avenue, N.W.
                              Suite 1100
                              Albuquerque, New Mexico  87102

APPEARANCES (Continued):

For Kannenberg, Esq.        SPRING SCHOFIELD, ESQ.
and Jackson Kelly PLLC:     BRIGGS CHENEY, ESQ.
                            DIXON, SCHOLL & CARRILLO, P.A.
                            6700 Jefferson Street, N.E.
                            Suite B
                            Albuquerque, New Mexico  87109

Also Present:               ROBERT DAVIS, ESQ.
                            CorrHealth General Counsel

                            ROBERT TWEEL, ESQ.
                            Managing Member Jackson Kelly

                            SONIA SALAZAR, Paralegal
                            Rothstein Donatelli, LLP

                            MYRA MARTINEZ, Defendant

Reported by:                MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
                            United States Court Reporter
                            Phone:  (505)348-2334
                            Email:  Mary_Loughran@nmd.uscourts.gov


     Proceedings reported by machine shorthand and transcript

produced by computer-aided transcription.



                            *  *  *  *  *



                            I N D E X

                                                          Page

TESTIMONY OF CASEY COLE KANNENBERG
    DIRECT EXAMINATION BY MR. CHENEY ...................48
    CONTINUED DIRECT EXAMINATION BY MR. CHENEY ........75
    QUESTIONS BY THE COURT ............................84
    CROSS-EXAMINATION BY MR. HENDREN ..................96
    CROSS-EXAMINATION BY MR. HOLLAND .................124
    CROSS-EXAMINATION BY MS. BLAKE ...................137
    CROSS-EXAMINATION BY MR. LEONARD .................138

Martinez, et al. vs. CorrHealth, et al. - 22-CV-288

Order to Show Cause Hearing

* * * * *

(In Open Court at 9:37 A.M.)

THE COURT:  This is the case of Kristina Martinez, as Personal Representative of the Estate of Dale Rand Erickson, Deceased, Lucille Higgins, Brandon Erickson, Matthew Erickson, Jonathan Erickson, and Brianna Erickson, Plaintiffs, vs. CorrHealth Professional Limited Liability Company d/b/a CorrHealth, LLC, Bruce Boynton, Barry Schooley-Stanford, Oakley Blasdel, Kimberly Rich-Gainey, and Myra Martinez, in their individual capacities as employees of CorrHealth Professional Limited Liability Company d/b/a CorrHealth, LLC.

Beginning with Plaintiffs' counsel, would counsel enter their appearances for the record, please.

MR. LEONARD:  Yes, Your Honor.  Arne Leonard for the Plaintiff Kristina Martinez, who is the Personal Representative, as well as Lucille Higgins.  With me are Carey Bhalla, Alex Alvarado, Marc Lowry, and our paralegal, Sonia Salazar.  And I'm going to let Mr. Ruyle introduce himself as far as the Erickson children.

MR. RUYLE:  Good morning, Your Honor.  Sam Ruyle on behalf of the Erickson children.

THE COURT:  Okay, thank you.  Would defense counsel enter their appearances, please.

MR. BARNETT:  Good morning, Your Honor.  Chance Barnett on behalf of Dr. Bruce Boynton.

MR. SWEENEY:  Good morning, Your Honor.  Scott Sweeney on behalf of Kimberly Rich-Gainey.

MR. HOLLAND:  Chance Holland here for myself as former counsel for the individual Defendants.

MS. AH LOY:  Alexandra Ah Loy on behalf of myself and as counsel for all Defendants; former counsel.

MR. HENDREN:  Jason Hendren, Your Honor, here as former counsel of the Defendants.

MS. WILLIAMS:  Carla Williams, current counsel for Oakley Blasdel, R.N.

MR. RAPPAPORT:  Your Honor, Matt Rappaport on behalf of Myra Martinez, Defendant, who is also present in the courtroom with us today.

MS. BLAKE:  Good morning, Your Honor.  Michelle Blake on behalf of Defendant CorrHealth, and with me in the courtroom today is general counsel, Robert Davis.

MS. SCHOFIELD:  Good morning, Your Honor.  Spring Schofield and Briggs Cheney here on behalf of former counsel for the Defendants, Casey Kannenberg.  Also present today, Your Honor, is Mr. Robert Tweel, managing member of Jackson Kelly.

MS. BRENNAN:  And last, but not least, Christina Brennan on behalf of Defendant Barry Stanford.

THE COURT:  Did I get everybody's entry of appearance

then?  All right.

As a preliminary matter, I'm going to ask Plaintiffs' counsel to state on the record what relief or what you're requesting to happen as a result of this hearing.  In other words, what do you want me to do?

MR. LEONARD:  Yes, Your Honor.  Would you like me to speak from the podium?

THE COURT:  Sure.

MR. LEONARD:  Plaintiffs are requesting a default judgment against each Defendant, and a fee award against defense counsel, which there may be arguments about apportioning that amongst more than one law firm on that side. For the fee award, we are requesting that it go back to the time of the removal to this Court.

And then we have some step-down alternative relief if the Court is not inclined to enter a default judgment against a particular Defendant or because of the fact that the case goes on even if there is a default judgment on liability, is my understanding.  So that sort of alternative or step-down relief would be something we would want to brief in a -- we already have a motion pending to amend the pretrial order, which has kind of been superseded, so we'd want to amend that motion and do a motion for a new pretrial order that fits whatever sanctions the Court orders.

And then, the relief sought in that motion could

include more fine-tuning of things, if there's going to be a trial, things like striking witnesses that were not timely identified by the deadlines in the previous order setting the trial. You know, sustaining objections to defense exhibits, precluding defense theories that were not raised in jury instructions in a timely manner, striking affirmative defenses that were not raised, again, without any jury instructions, and things of that nature. And for that part of the relief, again, it would be kind of a second stage.

Once the Court has made a first cut as far as whether there's going to be a default judgment, preliminary fee award, those type of things, once we've figured out what is actually going to trial, we would ask, again, to file another round of briefing on how to do an amended pretrial order that reflects all of that and may include some lesser sanctions.

THE COURT: In terms of what Mr. Leonard stated, is that on behalf of all the Plaintiffs?

MR. RUYLE: Your Honor, for ease of this proceeding, Mr. Leonard is going to be the voice for all of us.

THE COURT: Okay. Now, one of the questions, and the reason I'm asking this initially to get on the record Plaintiffs' counsel position, is if a default judgment -- one of the questions I have is, if I determine a default judgment against CorrHealth would be appropriate, then you've indicated that you wish that default judgment to be against all

individual Defendants.  And in terms of the way -- looking at the status of the pleadings, certainly in a civil case there is no right to counsel for an individual defendant, but there is still due process interests, particularly notice, and I have some concerns based on the pleadings that I've reviewed. There's a real concern whether individual Defendants -- there may be a question whether individual Defendants, all of them, were served, or if there was an acceptance of service on behalf of all Defendants, whether that was authorized.  I mean, one of the reasons I vacated the trial is there were indications in the pleadings that individual Defendants didn't even know we were supposed to go to trial last week.

So how would you -- in other words, it seems to me if I'm right in that the individual Defendants were denied due process, that they didn't even have notice of the filing of the case or certainly notice of the trial date, then potentially it's going to be -- discovery may be opened up and it may very well be we're not going to get to trial on damages if a default judgment is entered.  How do you respond to that concern?

MR. LEONARD:  Without getting into detailed argument at this point before we hear from the other side -- I mean, there's plenty of arguments that the client is bound by the attorney's conduct, particularly where they've elected to pursue a unified defense.  But as far as just the procedural issue, I agree that -- and that's one of the things, because

Mr. Kannenberg's counsel has exhibits that they wanted to present for in camera review and we haven't seen those.

So I agree, there's a procedural due process issue of whether you can go directly to a default judgment against one or more individual Defendants, and they may not all be in the same boat, and whether we need to get, you know, an additional hearing or some additional process for them before we decide what we're doing with the individual Defendants.

THE COURT:  All right.  Before I start hearing from Defendants and defense counsel, let me kind of set the stage as I procedurally understand it, and certainly in counsel's presentations you can correct me if I'm wrong.

But it would appear that on January the 19th, 2024, the Plaintiffs filed a notice regarding a potential -- it's what's referred to as a Dunton conflict.  That's Document 108.  And Dunton is a case out of the -- it's Dunton vs. County of Suffolk.  It's a Second Circuit opinion, 729 F.2nd 903.  It's a 1984 Second Circuit opinion.  It kind of holds that where a conflict is serious and disqualification might be warranted, the District Court is under a duty to ensure that the client fully appreciates the situation.

"This Court" -- meaning the Second Circuit -- "has stated that when a potential or actual conflict of interest situation arises, it is the court's duty to ensure that the attorney's client, so involved, is fully aware of the nature of

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                             22-CV-288

the conflict and understands the potential threat to the protection of his interests."  And then a sentence or two later -- well, the next paragraph says:  "There are at least two reasons why a court should satisfy itself that no conflict exists or at least provide notice to the affected party if one does."  And the first reason they cite is:  "A court is under a continuing obligation to supervise the members of its Bar."

Now, in the Tenth Circuit case of Johnson v. Board of County Commissioners, a 1996 Tenth Circuit case, I think it's 85 F.3d 489, essentially the Tenth Circuit adopted the reasoning or the rationale in the Dunton case.  Just quoting a little bit from this Tenth Circuit case, it says:  "Given the potential conflict between the defenses available to a government official sued in his individual and official capacities, we have admonished that separate representation for the official in his two capacities is a wise precaution."

The Tenth Circuit goes on to state:  "While some courts have held separate representation is required in the face of the potential conflict, we decline to adopt a per se rule.  We hold that when a potential conflict exists because of the different defenses available to a government official sued in his official and individual capacities, it is permissible, but not required, for the official to have separate counsel for his two capacities."  Of course, in civil cases like this, potential conflicts can be waived, although in order for the

waiver to be valid, in my view, there needs to be an informed consent by a defendant to the waiver of conflict.

So again, that takes us back to January of this year when the notice regarding a potential Dunton conflict was filed.  That was Document 108.  In May, I ordered defense counsel to respond.  That was Document 114.  Then defense counsel Kannenberg responded in Document 116 stating that there is no actual conflict precluding representing the individually named Defendants in addition to representing CorrHealth.  That's at Page 2 of Document 116.

Attorney Kannenberg then further explained:  "At trial, Defendant CorrHealth will continue to defend and support its providers who are individual Defendants in this case."  And that pleading further states:  "To the extent that there is a jury verdict against all Defendants within limits of the policy, everyone is covered by that policy.  If there should be a jury verdict in excess of the policy limits, even an award of punitive damages against any of the individual Defendants that exceeds the policy, Defendant CorrHealth intends to satisfy any such award on behalf of the individual Defendants."  And then I believe in that same pleading at Page 3, it states:  "As a practical matter, the individual Defendants have benefited from having counsel that have represented them in this litigation for several years."  So my reading of that is that to the extent that there was a potential Dunton conflict, the conflict

had been resolved.

I'll also note that Mr. Kannenberg I think initially entered his appearance on behalf of all Defendants in a former law firm, and then I believe it was in March of 2024 that there was some kind of a pleading that indicated a notice of change of address, which from a reading of that, it would appear that Mr. Kannenberg then joined the Jackson Kelly law firm.  But it looks -- and again, when defense counsel make their presentations, I can stand corrected, but in all the relevant pleadings that were filed by Mr. Kannenberg, he filed them on behalf of all the Defendants.

Now, in June 2024, Mr. Kannenberg, on behalf of Defendants, filed a Motion for Reconsideration, that's Document 118, of my opinion granting Plaintiffs' Motion for Sanctions.  That motion was denied in Document 121, and my Memorandum, Opinion and Order, Document 115, stands.  That was the one granting Plaintiffs' request for spoliation sanctions. And so that decision of mine remained.

The pretrial order was docketed in this case in June of 2024.  That's Document 120.  In August of this year, I docketed an order scheduling the jury trial.  That's Document 122.  Pretrial deadlines were listed on the filing, and then I set a trial date for November 12th, 2024.

Nearly a month later on September the 13th, 2024, defense counsel filed a motion requesting a continuance.

That's Document 123.  Defendants requested trial be moved to December 2024, February 2025, or March 2025.  Plaintiffs did not oppose the continuance from November to December, but objected to a lengthier continuance.  That's reflected in Document 126 at Page 1.  So I scheduled a telephonic -- either a telephonic or a Zoom video conference.  I don't remember which one, but I do remember the conference.  That's Document 124.  And based on the representations of counsel at that September 26, 2024, hearing, I reset the trial for last week, to start December the 3rd, 2024.  The transcript would bear this out, but my recollection is Mr. Kannenberg affirmatively represented that his clients, meaning all Defendants, were available and agreeable to the December 3rd, 2024, trial setting.

As an aside, I wanted to get this case resolved by trial.  I had a criminal jury trial that was set last week, and so I had to move that into 2025.  And then it was a few days later that Attorneys Loy and Hendren entered their appearances on behalf of the Defendants.

On November 5, 2024, approximately one month before trial, Mr. Kannenberg moved to withdraw as counsel.  That's Document 133.  A week later, Attorney Holland entered his appearance on behalf of the Defendants, that's Document 137, while Attorneys Loy and Hendren moved to withdraw.  That's Document 135.  These three attorneys all work for the Hall

Booth Smith firm.

On November the 14th, 2024, Attorney Holland moved to continue the trial on behalf of all individual Defendants, and I ended up granting the motion because it appeared to me that based on the status of the pleadings, there were a number of individual Defendants, at a minimum, that didn't have notice of the trial setting.  In both Attorneys Loy and Hendren's Motion to Withdraw and Attorney Holland's Motion to Continue, they assert in the pleadings that Attorney Kannenberg, one, did not contact the individual Defendants since early 2023, and two, misrepresented that CorrHealth would satisfy an award against the individual Defendants, which is certainly contrary to what had previously been submitted of record that I quoted earlier.  I believe that was Document 116.  So I filed the November 14th, 2024, Order to Show Cause.

And then last, I'm going to touch some on the Memorandum, Opinion and Order granting Plaintiffs' Motion for spoliation of Sanctions.  That's Document 115.  I start off initially in that Opinion and say:  "This matter comes before the Court upon the Plaintiffs' unopposed brief filed pursuant to the Court's instructions in the prior Memorandum, Opinion and Order, Document 101.  In that Opinion, filed on November 21, 2023, the Court ordered Defendants to file supplemental briefing on various evidentiary issues, ultimately reserving ruling on Plaintiffs' motion for spoliation

sanctions.  Nearly six months have passed, and Defendants still have not filed their supplemental brief, as ordered."  I note that because in complex civil litigation cases like this, it's not been my experience that Defendants or defense counsel ignore Court rulings.

Then on the next page, I state:  "Further, the Court uses this ruling as an opportunity to warn Defendants' counsel that if further evidence of discovery violations is uncovered in this case, additional sanctions -- including entry of default judgment -- may be warranted.  The same holds true if Defendants fail to comply with future Court orders or deadlines."

Again, my intent was to send a very clear message that it's time that Court rulings be followed, that I'm not going to tolerate discovery sanctions, and it's time that this case get resolved either by trial or settlement.

On Page 5 of the Opinion, towards the bottom, I state:  "Finally, Defendants are hereby advised that they will comply with this Court's local rules, deadlines, and the Federal Rules of Civil Procedure.  Future violations may result in sanctions such as the pleading being stricken, monetary sanctions, or entry of default judgment."  Again, I'm trying to send a real specific message that, truth be known, I didn't feel like I really should be having to say this.

On Page 7, I state:  "Taken together, the totality of

the circumstances supports an inference of bad faith by Defendant CorrHealth that is sufficient to warrant an adverse inference instruction.  As mentioned, the surrounding circumstances establish more than mere negligence. CorrHealth's actions are not simply the failure to act reasonably and prudently, but instead indicate a dishonest purpose, moral obliquity, consciousness of wrongdoing, and a breach of a known duty.  Therefore, the spoliation of numerous records and electronically stored information was carried out in bad faith."  And I cite Document 72 at Page 4, explaining the records are no longer available to CorrHealth.

And then I state:  "And because bad faith has been established, the Court concludes in its broad discretion that an adverse inference instruction is warranted.  Finally, should evidence of further discovery violations on the part of Defendants surface, the Court notes that it would be inclined to take harsher steps, including entry of default judgment in this case."

And then the last part of the conclusion paragraph states:  "Defendants are hereby advised that this Memorandum, Opinion and Order serves as a warning that any subsequent violations of this Court's Orders or Rules may result, sua sponte, in sanctions, including entry of default judgment without further notice."  My view was, I had provided sufficient warning, I thought this case would be back on track,

I thought we would have this case proceed by jury trial last week, and we're here today.

So with that, who on the defense side wishes to go first?

MS. SCHOFIELD:  Your Honor, Spring Schofield.

THE COURT:  If you would, go to the podium to make sure the court reporter can hear you.  And you're going to have to refresh my memory.  I don't recall who you were representing.

MS. SCHOFIELD:  That's okay.  Spring Schofield on behalf of Casey Kannenberg and Jackson Kelly, the LLC.  And I'm not sure it's accurate to say I want to go first, Your Honor, but I know that your Order to Show Cause was directed -- as Your Honor just went over sort of the history, Mr. Kannenberg said perhaps it makes sense for me to go first.  But certainly if you believe that you'd like to hear from somebody else --

THE COURT:  No.  And, you know, I'm going to make one other comment.  I grew up in Virginia.  I went to law school at Washington and Lee.  I recall that the Jackson Kelly firm originated, or its main office -- and this, of course, was 40 years ago -- but its main office was in Charleston, West Virginia.  I don't remember who in my class, but I do recall some members of my law school class going to work for Jackson Kelly.  So it just strikes me that it's really unusual in the 23 years that I've been a judge on this court that that's the

type of admonition that I would make in a lawsuit where Jackson Kelly has entered its appearance.  So if you want to touch on that, feel free to do so.

MS. SCHOFIELD:  Certainly, Your Honor.  Well, first, you have a good memory.  Their headquarters is, in fact, in West Virginia.  Mr. Tweel, who is here today, Your Honor, is the Managing Member from West Virginia.  So that's a good memory.

As you reviewed the briefing, and you may be aware from just a review of your docket, the case actually started in state court.  It was then removed here.  At the time, it was handled by the Sharuzi Law Group, also out of Denver, where Mr. Kannenberg was then employed.  When Mr. Kannenberg went over to Jackson Kelly, he was asked to take the file with him, which he did.

Your Honor touched on -- I want to touch on it, as well, because you just did, the supplemental briefing.  I do note that in Plaintiffs' response brief, they asserted that somehow by touching on this issue that Your Honor raised in both the Order to Show Cause and then again here today, that we're seeking to re-litigate that issue.  That is simply not true.  We've not touched on the merits of it.  We understand where you came from on that day.

But I did touch on the briefing, and I can touch on it again today.  And certainly, Your Honor, it was a very

unfortunate error.  As you know, the issue of spoliation wasn't briefed by Plaintiffs' counsel, so Your Honor did not rule at that time.  You issued an order allowing for supplemental briefing, and then, unfortunately, that deadline wasn't calendered.  It was simply overlooked by Mr. Kannenberg and the Sharuzi Law Group, and it was overlooked, as you noted, for months, unfortunately.

When Mr. Kannenberg then transferred to Jackson Kelly and was preparing for other matters, he again reviewed Your Honor's order and he saw that deadline again referenced there.  I want to make clear to Your Honor -- because that was one of the questions that you raised, "Was that the first time he looked at my order?"  Not at all, Your Honor.  He looked at the order when it first came in.  He was simply reviewing it in the context of the ongoing litigation, and it was then that he realized, you know, his error.

He did try to take immediate steps to try and fix that, including reaching out to Plaintiffs' counsel, who graciously agreed that he could file his supplemental briefing out of time.  That is not to state that they agreed that there was any merits or defense to it, but procedurally, they were willing to allow that.  So he worked on it, and in the meantime, Your Honor issued that.  He then filed the Motion for Reconsideration, which as you noted you denied.

So that was certainly an embarrassing mistake which

Mr. Kannenberg was and remains embarrassed about, and when Your Honor issued the Order, you know, he took it very seriously. What we're here then today for is different.  We're not here talking about a missed deadline, we're not here to discuss, you know, whether there was a discovery violation.  As Your Honor, and I think rightfully so, given how this issue was presented to you initially -- I understand the Court's frustration. We're here talking about, I think, what you've described as his grave professional responsibility concerns, and that is what we would like to address here today.

Mr. Kannenberg is here.  He is willing to, and is prepared, Your Honor, to offer his testimony.  We also filed a motion to submit some material for an in camera review.

THE COURT:  Yes, and I'll go ahead and grant that motion.  I mean, I'll take a look at it in camera.

MS. SCHOFIELD:  Okay, Your Honor.  I have it available for you now, if you'd like, or if you'd like me to address it at the end of the hearing and provide it to you, I can do that.

THE COURT:  Yes, maybe at the end of the hearing.

MS. SCHOFIELD:  Yes, Your Honor, I will do that then. And just so you're aware, that material has been described. It's been privilege logged and the brief has been described for all counsel.  But obviously they haven't been provided with it.

So we would like to have Mr. Kannenberg testify and

sort of explain what happened.  Obviously we'd look to the Court's guidance on whether you want me to present my argument first or have Mr. Kannenberg testify first.

Also, because of the sort of unusual procedural process here in that the Defendants that Mr. Kannenberg previously represented all now have the numerous defense counsel you see here, Mr. Kannenberg continues, of course, to have duties to those and does not wish to disclose any confidential or privileged information in the presence of Plaintiffs' counsel, or now to the extent that they have separate counsel.  So we don't think it is appropriate to open Mr. Kannenberg up to cross-examination where it would be fraught with such things.  But obviously he's willing to answer any questions that the Court may have.  Again, we're just trying to be very aware of Mr. Kannenberg's ongoing duties to his former clients.  So Your Honor, we'll look for your guidance whether you'd like him to testify.

THE COURT:  Well, if he testifies, he's subject to cross-examination.  I'll leave it up to you in consultation with Mr. Kannenberg.

I mean, obviously one of the major concerns was the representation that when he was counsel of record in this case, he represented all Defendants.  And certainly he was put on notice about a potential conflict, and he filed a pleading stating, as I read it, and I'm assuming as Plaintiffs' counsel

read it, that to the extent that -- again, these type of conflicts, as you know, get worked out if there's a waiver. But as we got on the eve of trial, it became apparent in terms of the Motion to Withdraw, the other entries of appearance, that Mr. Kannenberg was not counsel of record for all, or at least the individual Defendants.  There was even a pleading by one of the defense attorneys that said some of the individual Defendants hadn't had any communication since 2023.

So again, I'm gleaning the information based on what was filed of record by defense lawyers in this case, not Plaintiffs' counsel.

MS. SCHOFIELD:  Your Honor, thank you.  I think at this time, unless Mr. Cheney -- I'm going to go ahead and address Your Honor's concerns, and then we will have Mr. Kannenberg.  We will talk to him briefly and have him testify.

First, I want to -- and I hope that some of the additional pleadings that have now been provided sort of shed light on what the conflict of interest was.  Mr. Kannenberg did represent all of the CorrHealth Defendants.  In responding to the Dunton Notice, I think Your Honor sort of accurately looked at it and said, you know, this Dunton Notice is a hypothetical. The Plaintiffs didn't point to any evidence in this case.  They didn't say, here's where we think there's a conflict.  I think they even described it as being done out of an abundance of

caution.  There's this hypothetical possibility simply because there's joint representation.

And so Your Honor issued this Order which asked him to address three discrete questions, and he addressed those.  In his response, which you went over in Doc. 116, what he explained is there is no actual material conflict, and he went on to explain why.  Because there's no actual material conflict, New Mexico Professional Conduct 16-107-A does not apply to this case, and because of the lack of an actual conflict, 16-107-B does not apply to this case.  So I think he tried to really lay out what his analysis was, which is there is no conflict of interest here.

THE COURT:  But how do you get -- again, you're talking about individual providers of health care services, so they're licensed by various regulatory authorities.  And certainly even, say, for example, if the insurance -- if a jury awards a verdict, and certainly if it's within policy limits, then individual Defendants are not maybe personally monetarily at risk.  But without even notice of a trial, an adverse finding, that can have consequences on somebody's professional licensure status.

MS. SCHOFIELD:  Sure, Your Honor, and that's --

THE COURT:  In other words, I just didn't feel like -- because of the notice, the lack of, or the issues regarding notice, and recognizing that a defendant in a civil

case still has a right to notice of a trial, I had to vacate this trial.

MS. SCHOFIELD:  And Your Honor, I certainly can jump forward to the notice --

THE COURT:  Well, I'm sorry, I don't mean to interrupt you.  I don't want to cut you off on your presentation.

MS. SCHOFIELD:  No, that's quite all right, and we'll get to the notice.  And you're absolutely right, certainly a defendant has a right to notice that there's a trial.  I think what's important is the language of 16-107-A, which is that a waiver is required only if the representation is directly adverse.  There's been no allegation in this case that any of the CorrHealth Defendants are pointing fingers at each other, or there is a -- and I'm emphasizing this here -- a significant risk that the representation will be materially limited.  The possibility -- the comments make this very clear, Your Honor. The mere possibility, the hypothetical that there might be something down the road, that doesn't give rise to a concurrent conflict of interest amongst joint representation.

But it's not just Mr. Kannenberg that came to this conclusion, right, Ms. Sharuzi initially entered her appearance on behalf of everybody.  We can only presume -- she's not here before Your Honor today -- that she did this analysis, as well, and concluded there is no conflict of interest.  After

Mr. Kannenberg, we know that Hall Booth Smith did the same analysis.  They looked at it and they said, look -- and their more recent briefing before Your Honor really makes that clear. These are Docs. 158 and 159.

Reading from Mr. Holland's briefing:  "There was no indication that CorrHealth and the individual Defendants were blaming or critical of another Defendant, nor were there conflicting views regarding the medical nurse care and treatment provided or the cause of Mr. Erickson's death."

Hall Booth Smith in Document 159:  "None of the individual Defendants testified adversely to one another's interests," and then they go on to discuss Dr. Bruce Boynton. "There was, therefore, no obvious conflict between CorrHealth and the individual Defendants."

So it's not just Mr. Kannenberg's analysis that there was no conflict of interest.  I think every defense counsel that has entered their appearance in this case has reached the same conclusion.

And again, when we were looking at the Dunton Notice -- I know that Plaintiffs' counsel have raised now a series of things, and I can address those if you want, Your Honor.  None of those under the case law would be sufficient to give rise to a Dunton concern.  At the time of the Dunton Notice, it was just a hypothetical.  All defense counsel who looked at this arrived at the same conclusion, Your Honor, that

there was no conflict of interest with the joint representation.

The conflict of interest, as alleged in the pleadings before Your Honor, was this representation that CorrHealth would satisfy an excess verdict.  I think maybe it was Mr. Holland who first called it the safety net representation. I then carried that term through to my briefing.  But whatever we call it, it was a dispute over that which gave rise to a concern about a conflict of interest.  And I just want to make sure that it's very clear to Your Honor, that dispute arose only after Mr. Kannenberg was terminated.  Mr. Kannenberg was not aware of any dispute about that during the time of his representation.

We can talk some more about that, but because Your Honor raised the question, what about the notice to the individual Defendants that there was a trial setting, the in camera briefing addresses in more detail Mr. Kannenberg's communications with them.  And I'm not going to touch on that, but obviously we can touch on when were they notified, when should they have been notified, and I think in that case -- and that's why we appreciate Your Honor having this hearing, because there's obviously background information that was not necessarily in the pleadings until the Order to Show Cause came out.

Your Honor entered the Order setting the trial for

November on August 19th.  On August 21st, two days later, Mr. Kannenberg's services were terminated by CorrHealth's agent, the carrier.  On August 22nd, he was advised that he needed to transfer all the file materials to Hall Booth Smith. So Mr. Kannenberg knew about the trial setting for two days before he was terminated and new counsel came in.

After Mr. Kannenberg was terminated, he has sort of competing obligations, Your Honor.  He has obligations to his clients, his now former clients, under 16-116-D, which in New Mexico is often described as orderly termination.  He has obligations under the Rules of Professional Conduct to incoming counsel Hall Booth Smith to not interfere with their relationship with their new clients.  He can't reach out to those clients.  It's expressly prohibited by the Rules of Professional Conduct.  And he has obligations to this Court.

As Your Honor is probably certainly aware, having addressed many Motions to Withdraw during your time, the Court can deny a Motion to Withdraw and they can do that for a variety of reasons.  It can be because it's the eve of trial, it can be because --

THE COURT:  They don't comply, the attorneys don't comply with the local rules.

MS. SCHOFIELD:  Absolutely, Your Honor.  You can say, try again, this doesn't comply with the local rules.  You can say, there's a bankruptcy stay, I'm not letting you withdraw.

There's a hundred reasons why the Court could deny it.

THE COURT:  Sure.  But since we're going chronologically, let me ask you a question.

MS. SCHOFIELD:  Yes.

THE COURT:  There was a status conference regarding the trial and the Motion to Continue.  Now, am I wrong -- I think that status conference was on September the 26th, 2024.

MS. SCHOFIELD:  You are correct, Your Honor.

THE COURT:  All right.  Now, my recollection -- and again, we can go look at who entered the appearances.  But Mr. Kannenberg -- this was going to be for the Motion to Continue the trial and to reschedule.  My recollection is Mr. Kannenberg was the only lawyer representing the Defendants.  Am I right on that?

MS. SCHOFIELD:  He was the only attorney that had entered their appearance.  You'll have to ask Hall Booth Smith why their appearance hadn't been entered yet.  I believe it was Mr. Kannenberg --

THE COURT:  Right.  But in other words, I don't recall -- in other words, it would have sent a red flag to me that if I'm scheduling a trial for December 3rd and I've got new counsel coming in for CorrHealth, they ought to be there to see if they're available.  And I don't recall any other attorney for the Defendants on that status conference except Mr. Kannenberg.  Now, am I wrong on that?

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                             22-CV-288

MS. SCHOFIELD:  You're not wrong, Your Honor.  Hall Booth Smith did not appear.

THE COURT:  So wouldn't it be incumbent upon Mr. Kannenberg, instead of agreeing and saying, this works for all the Defendants, to alert me that CorrHealth is moving in a different direction regarding counsel?

MS. SCHOFIELD:  It was, and he did, Your Honor.

THE COURT:  At the hearing?

MS. SCHOFIELD:  He did at both the hearing and in his briefing before Your Honor, yes, Your Honor.  In submitting the Motion to Continue, he noted that CorrHealth anticipated bringing on new trial.  Again, perhaps Hall Booth Smith can speak some more to the specifics.

It was his understanding that if the trial could not be moved from November to December, he might have to be retained again.  He had his own trial conflicts that would have been an impediment, but that was his understanding.  He worked with Hall Booth Smith.  The dates that were proposed were the ones that Hall Booth Smith provided him that would work for them.  And before he submitted it, and there's email communications that I don't believe are attached, Your Honor, but Hall Booth Smith references in their briefing where he said to them, here's the briefing, here's what I've done, let me know if you have any feedback.  So at all points, he's working with them.

He then invoked the briefing, he lets Your Honor and opposing counsel know that new counsel is coming in and that he has their authorization to make these representations, and then the transcript, which was attached, I believe as Document 170-14, although --

THE COURT:  I didn't go back and read that transcript before today's hearing.

MS. SCHOFIELD:  Okay.  Well, I think Mr. Leonard was nice enough to attach it, and he references it there, as well.

So you're right, Your Honor, he needs to let you know, and he did, repeatedly, that Hall Booth Smith is coming in.  He's saying, I appreciate I'm still counsel of record, right, and so I need to do these.  I have obligations for an orderly termination.  Sometimes that requires moving a trial setting, a hearing, extensions for discovery.  It can require an attorney, as Your Honor knows, who's been terminated to do different things to help preserve an orderly termination.  And so he's doing that.  He's honoring his obligations to the Court, even though he's been terminated, and then he's working with oncoming counsel to make sure that the representations that he's making are accurate and lets the Court know what's coming down the pike.

What he can't do, Your Honor, is he can't reach out to his former clients.  He has no authority to talk to them any more, and that's really clear.  The Rule of Professional

Conduct prohibits that.  So he couldn't reach out to them.

Now, there is, you know, admittedly some confusion, because Hall Booth Smith says, well, we thought he was reaching out to our clients, and Mr. Kannenberg assumes that they're talking to their new clients, and there's a lot of questions that we don't know, Your Honor.

THE COURT:  Sure.  And again, I haven't looked at the in camera materials, but I believe -- and I'll hear from Hall Booth Smith -- that it was the Hall Booth Smith lawyers, they're the ones that raised the issue that the individual Defendants weren't even aware of the trial and hadn't had communications with Mr. Kannenberg since 2023.

MS. SCHOFIELD:  Your Honor, in our briefing, we acknowledge that Mr. Kannenberg likely had not had -- if their recollection is that they hadn't had communications with him since sort of the spring of 2023, that is acknowledged in our briefing and explained in the in camera material.

I think as Your Honor was going through sort of the history of what happened, what we know is the real problem with the individual Defendants is that they weren't even notified about the trial setting until apparently early November, and it wasn't done by Mr. Kannenberg.  I mean, we can readily acknowledge that, because he was terminated two days after he found out about the trial setting.  So he didn't feel like he could ethically reach out to somebody else's clients and give

them a heads up on this trial setting.

The communications that we have provided to the Court make it very clear that the CorrHealth carrier indicated that they were going to let Hall Booth Smith know about this upcoming trial setting, and so we assumed that was done.  When Mr. Kannenberg was discussing with Hall Booth Smith, you know, working with them to try to move the trial setting and they're telling him, these are the dates that work, you know, the reasonable inference there is that they've reached out to their new clients and that these are the dates that work for them and their new clients.

THE COURT:  When you talk about the notice, I'm looking at Document 123 --

MS. SCHOFIELD:  Yes Your Honor.

THE COURT:  -- and on Page 3, Footnote 1, and I'm quoting:  "Note" -- I'm sorry.  This is Defendant CorrHealth's Partially Unopposed Motion to Continue and Reset Trial.  It was filed September the 13th.  It's signed by Mr. Kannenberg, and it does say, "Attorney for Defendant CorrHealth, LLC."

But Footnote 1 says:  "Note that it is anticipated that Defendant CorrHealth will be bringing on new counsel from another law firm to participate in the trial in this matter."  It doesn't say Mr. Kannenberg's terminated from his representation of CorrHealth.

And then in the transcript, and that's Document 142,

Mr. Kannenberg -- as a segue into this, it used to be back 20, 30 years ago that if a firm that primarily practices out-of-state is handling the case, you'd hire local counsel. That practice has kind of gone by the wayside. It's a lot cheaper not to have to hire local counsel. But the advantage when those firms did hire local counsel is that local counsel, if you've got good local counsel, they were familiar with the local rules. Now, I've learned by sitting by designation in every District Court within the Tenth Circuit that each District kind of has its own culture and its own way of doing things, and by having local counsel familiar with the practice, then that kind of helps in the situation where judges get frustrated with out-of-state lawyers who aren't familiar with the way practice is handled.

I think I did a -- that transcript reflects that I was talking about some of the issues over the years that I've experienced with Texas lawyers, and I'm not hostile to Texas lawyers -- I used to be one -- but I gave that as an example. And then Mr. Kannenberg says -- you know, I said, "I hope you don't take offense," and he goes: "No offense taken. I understand how you may have come to form that impression. As I mentioned in my Motion to Continue, there is another law firm that is likely going to be appearing for Defendant CorrHealth for purposes of trial, but I will make sure to have a discussion with them about the local rules so that everybody is

agreeing to be bound by the local rules and to follow local rules and practices."

But again, there was nothing that even remotely suggested that we're not going to go to trial on December the 3rd.

MS. SCHOFIELD:  No, I think nobody anticipated it. Certainly not Mr. Kannenberg, Jackson Kelly, or this Court had any reason to suspect that this matter wouldn't proceed to trial on December 3rd.  From Mr. Kannenberg's perspective, again, he understood that at least Hall Booth Smith could not make the November trial setting, nor could he, so regardless of whether or not this Court allowed him to withdraw, the November trial setting was going to be an impediment.  Once the December trial setting that had been agreed to by incoming counsel was set, I think it was the expectation of everyone that that trial was going to go forward.

THE COURT:  Sure.

MS. SCHOFIELD:  So again, I appreciate Your Honor's concerns that here we are now with a lot of new faces in the courtroom, myself included, and no trial setting, but that was not the expectation at the time.  I think at the time it was, this December trial setting has been agreed to by everybody, it works, and this is what's going to happen.  This case is either going to be settled before then or tried.

I do want to briefly, Your Honor, talk about maybe

some of the things that we don't know, that Mr. Kannenberg doesn't know, and it's probably appropriate that we don't know them and maybe we can't know them, but just to suggest, Your Honor, that there may be more going on here than can be disclosed because of privilege, confidentiality concerns, work product.

We don't know when Hall Booth Smith was first retained.  Their briefs expressed dismay that by August 22nd, they hadn't been provided with the file information despite, they say, repeated assurances that it was coming.  I don't know who those assurances came from, because the information that we provided to Your Honor, that was the same day Mr. Kannenberg was provided their contact information.  So we don't know what day they were retained, Your Honor.  And again, that's not necessarily something that we needed to know, but in terms of what Mr. Kannenberg and Jackson Kelly's role was, they can only act when they know something, which happened on August 21st. That's when they were told the file is being transferred.

August 22nd, they're given the information for Ms. Ah Loy at Hall Booth Smith.  We don't know what Hall Booth Smith was told about Mr. Kannenberg's continued involvement. As I've expressed to Your Honor and as the communications we attached indicate, he was told, you're being terminated, the file is being transferred, right, and we have his contemporaneous communications inside the firm saying, we're

out, you know.

And then when it's found out that maybe Hall Booth Smith can't make the November trial setting, there's this, well, maybe he has to do it. You know, he's going to work under his duties with the orderly termination, his duties to the Court. We're going to see if we can get a December or later trial setting, with Your Honor intimately agreeing to the December trial setting.

Hall Booth Smith indicates that they thought maybe he was going to be co-counsel. I don't know the basis for that. That was certainly never communicated to Mr. Kannenberg. He was told, and these are attached as Documents 167-1 and 167-2, where he's told, the only thing you have authority to do right now is to continue to bill until this trial setting is moved, and once that trial setting was moved, he was done. He was out.

Then 167-4 is where Mr. Kannenberg was asked, without explanation or reason, just, you know, to withdraw. That didn't surprise him, because he had been told he was going to be out. So when Hall Booth Smith says, well, we thought maybe he was co-counsel for a period, we don't know what the basis is for that, and certainly we don't know what we don't know.

If they had some reason, that's not what was communicated to Mr. Kannenberg. He was told unequivocally that he was out, and that if the trial could be moved, that was it.

His representation would end.  But that may explain why they thought maybe he was reaching out to their clients.  And again, we don't know what their basis for that understanding was.

THE COURT:  So is it your position Mr. Kannenberg was appearing in a limited capacity at that hearing?

MS. SCHOFIELD:  No, Your Honor.  I know that Plaintiffs' counsel raised this, as well, that --

THE COURT:  I guess I'm confused, because the word termination -- I think it was your choice of words.

MS. SCHOFIELD:  That's the word that the Rules of Professional Conduct use.  I don't think that is the word that was used with Mr. Kannenberg.

THE COURT:  So if he was -- I don't know if termination is the right word.  But CorrHealth had made a decision to move in another direction in terms of counsel.  So my question is, in what status was Mr. Kannenberg appearing, then, at that September status conference when we set the trial date for December?

MS. SCHOFIELD:  Your Honor, there can be this limbo stage, right, and again, the word termination is simply the word that's used by the Rules of Professional Conduct, so it's the word that I elected to use.  Whatever it was, the file is being transferred, you're no longer on board.  Those sorts of situations happen to lawyers all the time.

THE COURT:  And I agree, and I don't take issue with

that.  But then there's a local rule of this Court, 83.4(c) that says:  "An attorney may not appear in a limited manner except by Court order."

MS. SCHOFIELD:  Your Honor, I also looked up some of the case law on that, because frankly, Plaintiffs' counsel raised this.  Well, if you're terminated, you still have, until the Court allows you to withdraw, you have a general entry of appearance and everything that goes with that.  No matter what you might want to do with the attorney-client relationship, no matter what the client may want to do with the attorney-client relationship, I mean, the robe wins.  If the Court says --

THE COURT:  Right, because last-minute motions to substitute counsel or withdraw are generally disfavored by trial judges.

MS. SCHOFIELD:  They absolutely are, and for good reason.  So you're not entering a limited entry of appearance. You have already advised the Court, I'm here, I have this general entry of appearance, I'm doing everything.

Now there's something else that's going on with the relationship.  You're still counsel of record, right, until the Court allows you to withdraw, and our Rules of Professional Conduct recognize that, which is why 116-D says you need to do certain things to make sure there's an orderly termination. And again, that could consist of -- I saw some case law where, you know, this Court said, your client has fired you, but I'm

not going to let you withdraw because you represent a corporation until new counsel comes in.  Courts can do that. That doesn't mean that there's a limited entry of appearance. There's still a general entry of appearance.  What it means is that the Court is exercising control over its judicial proceedings and dockets, which it is entirely allowed to do.

Mr. Kannenberg is trying to accomplish all of these things that all of us attorneys have to do within our professional judgment.  I need to balance my duties to my former clients, my duties to oncoming counsel, and my duties to this Court.  So he's advising the Court, I understand new counsel is coming in if the trial can be moved, I'm not reaching out to my former clients, and I'm trying to help in whatever way I can to facilitate an orderly termination.

As an aside, Your Honor, I did try to find something to directly refute this idea that you should have a limited entry of appearance, other than what I just explained to you about the way that it works and that a general entry of appearance, you can't just simply convert that to a limited. The Rules don't allow that.

I did find a Special Master report that was submitted to Judge Black in which a Special Master took great offense to an attorney even attempting that, having a general entry of appearance and then trying to convert it to a limited.  And she said, no, no, no, what you need to do is withdraw and then you

can ask the Court to enter a limited one.  But we're not just going to convert this midstream, you need to do this the right way.  And I think that's what Mr. Kannenberg was trying to do, Your Honor.

Sort of returning to maybe, you know, what might else have happened, we don't know what happened after Mr. Kannenberg was terminated.  Hall Booth Smith indicates that they were engaging in settlement discussions, they were doing other things, presumedly preparing for trial.  Mr. Kannenberg wasn't involved in any of that.

When Hall Booth Smith had concerns about the safety net representation, nobody reached out to Mr. Kannenberg. Nobody asked him what his take on it was, you know, what he could shed on that.  But I think all of that just goes to Mr. Kannenberg's reasonable interpretation and what he was expressly told, that he was no longer counsel, that counsel was Hall Booth Smith and they were running the ship here.

I do want to briefly talk about, Your Honor, the safety net, as I'll refer to it, representation, because I think, and for good reason, it gave this Court significant concern.  Because when it was raised to the Court, the representation was that it was inaccurate and never authorized. And those were the pleadings that Your Honor received in mid November.

The presentation of this issue has changed.  Now

there seems to be an acknowledgment than it was authorized. But what the pleadings suggest is that CorrHealth, they allege, was not adequately informed of the risks.  They refer to it as a consent discussion that they take issue with maybe the quality of, it's not clear and maybe it can't be clear.  But those are now Docs 158 and 159.  So despite the allegations that generated the Order to Show Cause, and certainly reasonably would have caused this Court to say, why is Mr. Kannenberg making a statement that's unauthorized, that's not the case anymore.  I think it's been acknowledged by everyone that whether or not they agree with the statement, it was an authorized representation.

And again, Mr. Kannenberg wasn't aware of any dispute about this.  Nobody raised it with him.  He found out the exact same day Your Honor did, which was on November 12th when the pleadings started coming in.

Because the assessment was that there was no conflict of interest, and now we know there's a dispute about the safety net representation, we don't know the exact details and probably should not know.  That is between CorrHealth and their current counsel.  But again understanding where the Court's Order to Show Cause generated from, the question would have to be, was this waive-able?  This representation was made, we now know, after Mr. Kannenberg is out, that there's a dispute about it.  Is it waive-able?  Because if it isn't waive-able, then

Hall Booth Smith can't represent anybody, right, and this is what Your Honor noted in the Order to Show Cause.  It's our Rule of Professional Conduct 16-110 regarding the imputation of conflicts.  If it is waive-able, then Hall Booth Smith could have the individual Defendants waive it.

THE COURT:  And I agree with that.  The problem is, it wasn't clear to me that what was formerly viewed to the extent there's a conflict, it's been waived and all Defendants will be represented by the same lawyer or the same law firm.  And again, I'll give Hall Booth Smith a chance to comment, but the Hall Booth Smith pleadings suggested that, no, there is a conflict and it hasn't been waived.  That was the red flag that went up in my mind.

MS. SCHOFIELD:  And I agree, Your Honor.  And I can't tell, either, whether the assessment was that it was waive-able so that the firm could continue, or not waive-able so that the firm couldn't continue, because it was kind of a split of the baby, right.  It's not waive-able, so we're going to withdraw, but we're still going to have our firm.  So I agree, and I don't know.  I'll let them speak, to the extent they can, about that.

I guess for the purposes of Mr. Kannenberg and Jackson Kelly, what's important to remember is that this dispute arose after he was terminated and he had no involvement, nobody gave him the heads up.  To this day,

Mr. Kannenberg cannot take the stand and tell you what the nature of the dispute is.  He doesn't know, other than what's publicly filed, because he had been terminated and new counsel had come in.

I guess unless Your Honor wants to -- several issues were also raised.  I mean, we've tried to focus, and I appreciated Your Honor going over sort of the timeline, which helped us say, like, this is where I'm coming from, but in briefing, you know, some of the things that were raised were, well, what happened when Lewis Brisbois had this in state court?  What about succession planning, where are we with that?  How about CorrHealth's contractual obligations with an entity that's no longer a party?

So lots of issues were raised, Your Honor.  I haven't tried to address them all, but I am obviously willing to answer any questions Your Honor has if there's any issue that's been raised by the briefing.  What I've tried to focus on is what we see as what generated sort of this procedural posture, and that was new counsel coming in, an allegation that the safety net representation was unauthorized, that it arose after Mr. Kannenberg was terminated, and a failure to timely notify the individual Defendants of the trial setting, which I hope we've tried to explain the background of.

Mr. Kannenberg could not have ethically done that.  I appreciate that maybe somebody might stand up here and say,

look, we weren't asking him to provide legal advice to them, just call and tell them about the trial.  Respectfully, there's no clerical exception to the Rules of Professional Conduct.  You can't have somebody call your client to give them a heads up.  If he's calling them when they have new counsel, which is what he's told, he is -- I mean, he's committing a clear violation of the Rules of Professional Conduct.  So he tried to proceed in good faith using his best professional judgment, and he's sorry, and I think all of us are sorry that we're currently here before Your Honor with this procedural posture.

Unless Your Honor has any questions, if I may, I'd like to spend just a moment to talk to Mr. Kannenberg and see how we might proceed with his testimony, Your Honor.

THE COURT:  Sure.

MS. SCHOFIELD:  Your Honor, Mr. Cheney is going to handle the examination of Mr. Kannenberg, so I don't know if he wants me to continue talking.  I'm a big talker, Your Honor.

MR. CHENEY:  Would the Court entertain just a comment from me, a personal comment?

THE COURT:  Sure.

MR. CHENEY:  I look around this courtroom and I know a couple people; not many.  I know Your Honor.  And so this is just a personal sensitivity.

Your Honor knows me, and maybe there's a couple of people that are here from the New Mexico State Bar.  I am the

New Mexico State Bar's recovering drunk poster boy of sorts. The personal comment is, I have a leg that's gone dead.

THE COURT:  If you need to remain seated, that's fine.

MR. CHENEY:  No, no, I can stand, it's just sometimes it looks as if I've been drinking, and I've not been drinking. I just want Your Honor to know that.  It's a sensitivity.

THE COURT:  I would not consider you likely to have fallen off the wagon.

MR. CHENEY:  I appreciate it, Your Honor.  With that comment aside, and I do appreciate the Court allowing me to at least make that comment, Your Honor's introduction, your recitation of the chronology, and Ms. Schofield's argument thus far makes what we'd like to do a little anti-climatic.  We had planned to, and at the moment I would like to put Mr. Kannenberg on the stand, because, you know, we talk about all this law stuff and whatnot -- Your Honor has good reason, I understand, and everyone here I think understands why you're concerned.  So it seemed important to me that you saw Mr. Kannenberg, you heard from Mr. Kannenberg.  He's going to say, in large part, what Ms. Schofield has argued to you, but he'll give it perhaps some nuances.

Where I hesitate is, I look at this as a matter between Your Honor, or the Court, and Mr. Kannenberg and his law firm.  And because there's so many questions, as

Ms. Schofield has noted, that we have no idea the answer for, I'm not inclined, or I would not like to have him subject to cross-examination, other than from the Court. I see this as a matter between Mr. Kannenberg and the Court, not amongst, or by and between all these lawyers.

THE COURT: Well, if there's not a waiver of attorney-client privilege, I wouldn't allow -- I would sustain an objection on attorney-client privilege. But I think if he's going to testify, in terms of the scope of his direct, I think Plaintiffs' counsel have a right to cross-examine him.

MS. SCHOFIELD: Your Honor, with the Court's indulgence, and as I had indicated, Mr. Cheney had planned to handle this.

THE COURT: Sure.

MR. CHENEY: Your Honor, we filed a notice on Sunday, I think, of documents that I might refer to, or we might refer to today, simply to refresh Mr. Kannenberg's recollection. Frankly, to make things move a little quicker. I have a notebook with those documents, and I have one for the Court, if it'd like it. Do you have any objection to me allowing Mr. Kannenberg to take that notebook to the stand?

THE COURT: Not at all. Are those pleadings in the case?

MR. CHENEY: Yes. I think you referred to most of them today.

Martinez, et al. vs. CorrHealth, et al.                    12/10/2024
Order to Show Cause Hearing                                 22-CV-288

THE COURT:  That's fine.  I would normally take judicial notice of it.  I'm assuming there's no objection to that, Mr. Leonard?

MR. LEONARD:  No, Your Honor.

MR. KANNENBERG:  Your Honor, may I approach the witness box?

THE COURT:  Sure, go ahead, and I'll ask the Clerk of the Court to swear you in.  And just for scheduling, I've got to take a break around 11:30, because I've got a lunch meeting.  So I would propose we go to 11:30, and then we'll resume after lunch.

MR. CHENEY:  And Your Honor, as I've said, you-all have made his testimony a little bit anti-climatic, so I'm going to try to move him along and get to the important parts as best I can.

THE COURT:  Okay.

MR. GARCIA:  Please raise your right hand, sir.

(WHEREUPON CASEY COLE KANNENBERG WAS DULY SWORN UNDER OATH)

MR. GARCIA:  Please have a seat and state your full name for the record.

THE WITNESS:  My name is Casey Cole Kannenberg.

THE COURT:  Go ahead, Mr. Cheney.

MR. CHENEY:  Thank you, Your Honor.

TESTIMONY OF CASEY COLE KANNENBERG

DIRECT EXAMINATION

BY MR. CHENEY:

Q.   Mr. Kannenberg, it's already been announced that you are counsel of record currently in this matter and you work with the Jackson Kelly Law Firm.

A.   Yes, Mr. Cheney.

Q.   And it's been discussed today that Jackson Kelly has not always been the law firm that was representing the Defendants in this case, correct?

A.   That's correct.  As of March 1st, Jackson Kelly has been counsel of record in this case.

Q.   At that point in time, were you working with the Sharuzi Law Firm?

A.   Yes, prior to March 1, 2024.

Q.   And this matter that we're before the Court on today, or this case, is this a matter that came to you?  Is this a case you took in at the Sharuzi Law Firm?

A.   No.  This is -- and again, she's not here to speak.  But CorrHealth was a client of Jackie Sharuzi, who was my employer at the Sharuzi Law Group.

Q.   Had you worked with Ms. Sharuzi for a period of time?

A.   Yes.  I'd worked with her since 2016.

Q.   Okay.  Now, you didn't take this case in.  Who did the intake on this case, as far as you know?

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

A.   My best recollection on that is it would have been Jackie; Ms. Sharuzi.

Q.   During your tenure there, did the Sharuzi Law Firm have its own procedures for conflict analysis and evaluation before they accepted a case?

A.   Yes, they did.

Q.   Do you have every belief that that was followed in this particular matter?

A.   I have no reason to think that it wasn't.

Q.   Now, at some point, you obviously got involved in this case.   Just quickly tell the Court and everyone here, how is it that Casey Kannenberg got involved in the Martinez litigation?

A.   Sure.  So this would have -- February 2022/March 2022 timeframe is my recollection of when Ms. Sharuzi brought CorrHealth into the firm as a new client, and there was the Martinez case and several other matters that I think came over, as well.  I think Ms. Sharuzi probably said, hey, I've got this guy, Mr. Kannenberg, who's going to help me out on these cases.  So I was brought in to help her with the CorrHealth matters, including the Martinez case.

Q.   Did you become involved actively in the case?

A.   Yes, I did.

Q.   Okay.  Now, we've also mentioned, or there's been mention of an insurance company.  We know CorrHealth is one of the Defendants.  Did you, because we're going to talk about some

specific people, did you have someone, a point of contact, at CorrHealth?

A.   Yes, I did.

Q.   And who was that?

A.   It eventually became a woman by the name of Kim Day.  I believe when I first started working on the file, it was another individual, and her name escapes me right now.

Q.   Okay.  Now, would that be CorrHealth or Aspen Insurance?

A.   Aspen Insurance.

THE COURT:  I'm sorry, what was the name of the insurance?

THE WITNESS:  Aspen.

THE COURT:  Okay, thank you.

BY MR. CHENEY:

Q.   Is that the carrier that had retained the Sharuzi Law Firm and then subsequently the Jackson Kelly Law Firm?

A.   That's my understanding, yes.

Q.   Okay.  So Kim Day was your contact at the insurance company?

A.   Yes.

Q.   What about CorrHealth?

A.   My go-to contact at CorrHealth was a gentleman by the name of Tim Hammond, who was the Director of Risk at CorrHealth.

Q.   Okay.  So you told us you got involved in this case.  Let me ask you, describe if you can for the Court and everyone

here, just tell me, how was this case litigated?

A.   I think we worked it up like we do any correctional healthcare case.  We had had a lot of cases like that before.  Discovery.  There was discovery directed to the individual Defendants as well as CorrHealth as an entity.  We were involved in working with the individual Defendants to help them prepare their answers to those discovery responses and do their verifications.  We got the written discovery.  We served our own discovery on Plaintiffs, and that whole process played out like it would typically.

We proceeded to oral discovery.  We did depositions in the kind of February to March 2023 timeframe.  After I was assigned, we retained experts, as we typically do.  We got three experts involved, which is pretty typical for a case like this.

Q.   Well, I don't get over here often, but I do know the Federal Court runs cases pretty tightly, correct?

A.   Correct.

Q.   Was there a case management order in this case?

A.   Yes, sir.

Q.   Okay.  Did the parties, both sides, comply with that scheduling conference, or case management order?

A.   I believe -- I believe there might have been a few extensions of the case management conference, but I do recall working with Mr. Leonard over the life of the case, about two

years, and he handled the representation of his clients very professionally and I thought we had a very collegial relationship. So when something came up, I feel like we made a good faith effort to try to work it out.

Q. Now, in the course of litigating this case, there was paper discovery?

A. Yes, sir.

Q. Was paper discovery, Interrogatories and whatnot, propounded to all of the Defendants, both CorrHealth as well as the individual Defendants?

A. I believe so.

Q. Did you have occasion to work with all of the Defendants in responding to the discovery?

A. I'm not sure if I worked with all of them or if there was some division of labor. I do know in reviewing the file that I did work with some of the individual Defendants to help them, scheduled telephone calls to help them prepare their -- to get information to plug into the responses, and communicated with them by email to coordinate having them sign their verification pages.

Q. Okay. And what about, were depositions taken in this case?

A. Yes, sir.

Q. Were all of the -- was there a 30(b)(6) representative deposed on behalf of CorrHealth?

A.    Yes.   That was Mary Zold, who I believe was the Chief Operations Officer at CorrHealth.   She was the 30(b)(6) witness who testified in this case.

Q.    And were each of the individual Defendants deposed?

A.    I believe with the exception of Dr. Boynton, yes.

Q.    Okay.  Were you involved in handling the depositions of the CorrHealth 30(b)(6) representative and the other individual Defendants, other than what you've noted?

A.    I prepped and defended the 30(b)(6) witness and most of the individual Defendants.  I believe Ms. Sharuzi may have handled one or two.

Q.    And what is your style of preparing or handling a deposition for a defendant in a case?

A.    Typically, we'll do one or two preps.  Maybe a first one, since I was up in Denver and they were down in New Mexico, by Zoom, and then prior to the deposition, I would have met with them individually in person to do a second prep session.

Q.    Now, you don't have it before you, and I didn't give it to you, but roughly when was it that the case management order had said you guys needed to be done, on what such and such a date?  When was the end of discovery?  When was this case finished, so to speak, if I can put it that way?

A.    So most of that discovery had happened and was finished, I believe, by the kind of spring of 2023, March 2023 timeframe, and after that I believe we went into a period where we were

doing motions practice. You know, Motions for Summary Judgment, Rule 702 motions, things of that nature. But I believe by the March 2023 timeframe, we were pretty much done with any fact and expert discovery.

Q. Okay. So there's been mention today and there's been statements made in pleadings filed leading up to today that you had no contact with the Defendants for -- I heard several different things. Maybe several years, maybe two years. I want you to respond to that.

A. Yes. And I'm anxious about attorney-client privileged information, because --

Q. Of course. I just want to know, is that accurate?

A. So after their depositions, there would have been a debrief, and I don't want to go into what that conversation was. But I think I can say I described for them what the next steps would be, and I don't believe that I had conversations with any of the individual Defendants after that time.

Q. Okay. And roughly, just roughly, when was maybe the last deposition of an individual Defendant taken?

A. I think it was March of 2023.

Q. Was there a reason why you didn't have contact with the individual Defendants after that approximate date?

A. I don't know what I can say.

Q. Was there a reason for it?

A. Yes, there was a reason for it.

Q.   Okay.  At that point, you had talked to the individual Defendants and you had indicated to them what might happen next?

A.   Yes.

Q.   But after that, leading up to getting the trial setting, was there a reason for you to be interacting or communicating with them necessarily?

A.   I didn't believe there was.

Q.   And we're going to get to the Dunton Notice, of course, because the Court has a question about that.

So let's move to what I guess is kind of the starting point.  In your professional opinion, when was this case done and waiting for a trial setting?

A.   So we'd received a lot of orders resolving the motions that I had previously testified about in the fall of 2023 timeframe.  At that point, we're pretty much done and ready to go.  There had been a mediation in September and we were going to renew the mediation, and we did that, in fact, in May of 2024.  But aside from that, from my perspective, the case was worked up, ready to go, kind of in the fall 2023 timeframe.

Q.   Now, we know, and we're going to talk about it, that in 2024, the Plaintiffs filed a Dunton Notice, and then subsequently the Court entered its order asking you to respond.  Now, that happened in 2024, right?

A.   That's correct.

Q.   Okay, we're going to get back to that.  But other than that, the case was ready to go to trial?

A.   I believe it was.

Q.   Now, to use the Court's words, I think, in the Order to Show Cause, let's fast-forward to August 19th.  That's when the Court entered its Order setting this matter for trial in November.  Do you remember that date?

A.   I do, yes.

Q.   Did you receive the Court's Order?

A.   Yes.

Q.   What did you do with that Order?

A.   I believe it was either that day or the next day, I forwarded it to my contact at Aspen, which would have been Ms. Day, and Mr. Hammond, as well, advising them that the matter had been set for trial.  I believe I -- I guess I don't know how much I can go into here.

Q.   Okay, well let me -- so that's August 19th.  There's no question that you notified Ms. Day at Aspen Insurance, and then Mr. Hammond.  Had he been your contact at CorrHealth?

A.   Yes.

Q.   What happened after sending those communications -- I take it you probably did it by email?

A.   That's correct.

Q.   Okay.  What happened next?

A.   Very shortly after I sent the email, Ms. Day responded and

asked if I could set up a call with her.

Q.   Did you have a phone call with her?

A.   I did.

Q.   And share with the Court what that phone call was.

A.   Well, the first part of it was, she was informing me that she was retiring.  So we talked a little about that, gave her congratulations.  We had had a relationship and worked together for a couple of years.  And then the second part of the conversation was her informing me that this case was going to be assigned to a new law firm.

Q.   And if you can elaborate, what did you understand -- I mean, what were you told about the transfer of this lawsuit, or these lawsuits?

A.   Well, there's the conversation where I was told that I was being -- I know we're using the word terminated, but my understanding was that my representation of the CorrHealth Defendants was ending.  And then I believe the following day, Ms. Day memorialized our conversation in an email to me saying, you know, per our conversation, this is the new law firm, I'd like you to coordinate the file transfer.  And if I'm talking too much, feel free to cut me off.

She identified the law firm, said please initiate the file transfer.  She represented that she would be telling the new law firm about the trial date.  And there may have been a couple other lines in the email, but I think those were the

Martinez, et al. vs. CorrHealth, et al.        12/10/2024
Order to Show Cause Hearing                     22-CV-288

pertinent ones.

Q.    The three-ring binder I put in front of you, Tab 2, is that not the email you received on August 22nd?

A.    Yes, the second page of the tab.

Q.    Now, this is important to me, but how did you -- what did you -- Casey Kannenberg, what did you understand, following the phone call of August 21st and the August 22nd email, what did you understand your role professionally to be vis-a-vis this representation?

A.    As of that date and time?

Q.    Yes, sir.

A.    My role is to help them have an easy transition of the file to Hall Booth Smith.

Q.    Okay.  What did you understand your involvement professionally to be vis-a-vis the representation of the insureds CorrHealth and the individual Defendants?

A.    My understanding was that they were no longer my clients.

Q.    And what did you -- how did you -- what did you feel you could or couldn't do vis-a-vis the named Defendants in this case?

A.    My role was now to help get Hall Booth Smith the file and help facilitate that, and do whatever I can to protect the CorrHealth Defendants.

Q.    Did you believe you could communicate with the Defendants?

A.    I did not.

Q.   Is that your professional belief?

A.   That's my professional belief.

Q.   Was it your professional belief then?

A.   Yes.

Q.   And your professional belief today?

A.   Correct.

Q.   Now, the Court has raised this question, and Ms. Schofield has responded to it.  What did you see your role as vis-a-vis the fact that you were counsel of record in this matter?

A.   I guess the word is, a little awkward.  They told me that I'm no longer their attorney, but I do understand that at that time, I'm the only counsel of record in this case for the CorrHealth Defendants.  So it felt awkward.

Q.   And on receiving the email from Ms. Day on August 22nd, what steps did you take?

A.   I believe, yeah, looking at the first page of that document in Tab 2, I immediately reached out to my people at Jackson Kelly, in this case my paralegal, and said, hey, this case is no longer ours, we need to work with the new firm to transition our file to them for the continued defense of CorrHealth and the CorrHealth Defendants.

Q.   Okay.  So you took immediate steps to have the file transferred?

A.   Yes, sir.

Q.   The Court has raised the question today, and also in its

Order to Show Cause, why you didn't reach out and notify what I'll call your clients, the Defendants in this case, and advise them about the trial setting.

A.   So in addition to the call and the email terminating my representation, Ms. Day is saying, I will fill Hall Booth Smith in on the trial date.  So not only by virtue of being terminated did I not believe I had -- or it would have been inappropriate for me to contact any of the CorrHealth Defendants, but kind of further cementing that in my mind was Ms. Day saying, hey, I'm going to tell them about the trial date.

Q.   Was there any doubt in your mind following your phone call on the 21st with Ms. Day and her email on the 22nd that the new law firm had been retained and were taking over?

A.   No doubt at all.

Q.   And you relied upon the representation that she, Ms. Day, would advise the new law firm of the trial dates?

A.   That's correct.

Q.   Okay. What happened next?  You received this, you have the conversation, you received the email, you start the process of transferring the files.  What happened next?  What was the next thing that happened in regard to this matter?

A.   So the file transfer process had been initiated.  I think within a week, or certainly by the end of the month, my understanding was that the bulk of the file had been

transferred to Hall Booth Smith.

In early September, I had some phone calls and email exchanges with attorneys at Hall Booth Smith in which they had requested me to see if I could help get a continuance of the trial data.

Q.   And do you remember who it is that you communicated with?

A.   It would have been Jason Hendren.

Q.   Okay.  And I don't want to belabor it, but was there more than one conversation or communication?

A.   Yes.  I had a few friendly calls with Mr. Hendren, and several email exchanges, as well.

Q.   And his request was, can we get some new dates for the trial?

A.   Yes.

Q.   What did you do at that point?

A.   I believe there were conversations -- so there was a new Claims Professional assigned at Aspen.  I believe her name is Marilyn Valenciano.  Within a few days, she had emailed me and kind of given me some authorization to continue billing on this case for the limited purpose of trying to help get Hall Booth Smith a continuation of the trial dates.

Q.   If you turn to Tab 3, does that refresh your recollection as to communications with the new Claims Professional?

A.   Yes, that was -- that was it, yeah.

Q.   And the document speaks for itself, but what is Ms. -- is

her name Marilyn Valenciano?

A.   I believe it's Valenciano.

Q.   Okay.  What is she telling you?  How did you interpret her communication to you?

A.   You know, the first part of it, "Thank you for your help in handing out the file," that kind of reinforced what I had been told on August 21st.  And then, you know, she talks about giving me the authorization for continued billing on the matter toward that end; "that end" being helping work with HBS to facilitate a trial continuance.

Q.   Now, for those of us who work in the world of insurance defense, how did you interpret what she was saying to you?

A.   Work on this very specific matter and nothing else.

Q.   And that's what you understood on September 10th you were being instructed to do?

A.   That's correct.

Q.   Now, vis-a-vis the request from Hall Booth Smith that you attempt to see if you could continue the trial setting to another date, what steps did you take?

A.   I conferred -- well, first of all, I received a batch of dates from Hall Booth Smith that they said, hey, these are the dates we'd like to see if we could get.  And then there's a conferral requirement, obviously, so I reached out to Mr. Leonard to initiate the process of seeing what Plaintiffs position would be if we tried to get a continuance to these

dates that were requested.

Q.    And we're going to talk about the Court's concern that was raised in the Order to Show Cause about how you handled your Motion to Withdraw on November 5th.  When you were addressing and trying to respond to new counsel's request for a Motion to Continue, were you mindful of what the local rules of this Court require when you're going to file a motion?

A.    Yes, sir.

Q.    And in that regard, you complied with them?

A.    I did.  I had a series of communications with Mr. Leonard. Again, we typically were able to collegially come to an understanding, even if the answer was opposed.  But in this case, through several emails and maybe a phone call or two, it was my understanding that Plaintiffs would be okay with a continuance if it was only December of 2024 and not anything after that.

My recollection is that Mr. Leonard and I had had some prior phone calls about a trial date before I was terminated where we talked about the fall being kind of tricky for both of our respective trial calendars and whatnot, and I believe that was the case here, which is Plaintiffs were fine to move into December, but ultimately they would oppose the continuance to the extent we requested dates in 2025.

Q.    Okay.  Having had these discussions with Mr. Leonard, what did you do next in terms of the information you got from him on

what he was willing and not willing to do?

A.    I prepared a draft of the motion.  I believe Mr. Leonard and I would have circulated a couple of drafts with red lines.

Q.    And then did you communicate with Hall Booth Smith?

A.    So I think one of the last things I did before I filed, I had the red-lined version that was based on my conferral with Mr. Leonard and I shared the draft.  I just saw an email on this.  It's pretty fresh in my mind.  But I think it was on September 12th that I circulated the most updated draft of the Motion to Continue, and requested that Hall Booth Smith make any edits or revisions to the draft.

      And I believe it was also around this time that I included the footnote, because I wanted to make sure that the Court was going to be aware that new counsel would be stepping in.  That footnote was kind of my entre to do that.

Q.    Now, specifically, did you discuss with Hall Booth Smith the new dates?  The agreement that you reached with Mr. Leonard about what was agreeable, did they give you feedback on those dates?

A.    They gave me, I guess I would call it permission since I'm trying to help them facilitate a new trial date.  But those were the dates they said would work.

Q.    Okay.  Did you understand that those dates were good with this new law firm?

A.    Yes.

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

Q.   Was there any indication in this communication, working out towards a final Motion to Continue, that Hall Booth Smith was not going to become involved as new counsel for the Defendants in this case?

A.   No.   They were coming on board.

Q.   You mentioned a footnote.   I'm looking at the Motion, which is Document 123 for those using their computers.   The footnote is on Page 3, Footnote 1.   Look at that.   I want to know, why is it that you felt it necessary to include Footnote No. 1?

A.   Well, for one reason, to avoid being here today.   But, again, I'm counsel of record.   At this time, they hadn't appeared.   I understand I'm an officer of the Court, I have duties and obligations to the Court that are independent of the fact that I've been terminated by my clients.   So I'm letting the Court know that these dates are clear with the new attorneys that are coming on board.

So in other words, I'm not going to file this, and then the new attorneys are going to come in and try to get a continuance because the dates don't work.   I was trying to kind of put the Court's mind at ease that these dates were acceptable to new counsel.

Q.   The last sentence of Footnote No. 1 reads:   "In the interim, the undersigned counsel has been authorized to represent that the proposed dates in this motion work for

Defendant CorrHealth's new counsel."  Was that footnote, that language, in the red-lined draft or the final draft that you submitted to Hall Booth Smith?

A.   So the reason I made that specific representation was because when I had sent the draft to Hall Booth Smith asking if they had any edits or changes, or anything to modify, the response I got was, looks great, thanks.  So there were no edits or revisions to the draft I circulated.

Q.   Okay.  Now, in negotiating or trying to come up with a Motion to Continue that would be agreeable to all parties, did you reach out to the Defendants in this matter?

A.   I did not.

Q.   And maybe you've already said, but why not?

A.   I didn't believe it would have been appropriate or ethical for me to do so.

Q.   And that's because?

A.   I was no longer their attorney.

Q.   Okay.  So at that point, you got the agreement from Hall Booth Smith that they were on board in this and the motion was filed on, I think, September 13th; is that correct?

A.   Yeah.  Can I make a clarification?

Q.   Sure.

A.   Because I know that Hall Booth Smith had said I didn't represent to them that I had not contacted the individual Defendants, and that's true.  There was no discussion between

myself or anyone at Hall Booth Smith about me contacting individual Defendants.

Q.    Did you make an assumption at that point?

A.    I think I did.

Q.    And that assumption would have been?

A.    That the dates that were provided worked for the CorrHealth Defendants.

Q.    Okay.  And, in fact, in the motion on Page 2, I think, the motion recites in Paragraph 4:  "First, counsel for Defendant CorrHealth and Plaintiffs' counsel conferred promptly on the possible need for a trial continuance.  Trial in this matter is still two months away.  Counsel for the parties have been working diligently to determine the parties' availabilities in order to provide the Court with other possible dates."  So you believed that had been done --

A.    Yes.

Q.    -- by the new counsel?

A.    That's correct.

Q.    Okay, so that gets filed.  Did you communicate the filing of that to Hall Booth Smith?

A.    Yes, I did.

Q.    And let me suggest to you, or ask you to turn to Tab 5 and ask if that refreshes your recollection on what communications you had with Hall Booth Smith regarding the filing of the Motion to Continue.

A.    It looks like on the 13th of September, I forwarded a copy of the file-stamped motion to Mr. Hendren, and he responded: "Thanks, have a good weekend."  And I know there were some communications a couple of days later.

Q.    Does this email refresh you that on September 16th, you received an email from Mr. Hendren?

A.    Yes.

Q.    And what is he requesting of you?

A.    So I think we had discussed in our phone conversations about adding a request for a status conference so we could get in front of the Court to discuss the motion, and on the 16th, he says:  "Let me know if we can get a conference call with the Court this week about the motion."

Q.    Had you had a prior discussion with Mr. Hendren regarding a possible meeting with the Court, a possible status conference?

A.    Yeah.  I recall that was part of our phone conversations. I don't know if it's in another email or not, but I believe we discussed it.  And that request was included in the motion.

Q.    Okay.  And looking back at the motion, at Paragraph 11 of the motion on the last page:  "Defendant CorrHealth additionally requests a status conference to discuss these issues with the Court."

So you had responded to Hall Booth Smith's request that they have a conference with the Court?

A.   That's correct.

Q.   And did you communicate that to Mr. Hendren in your email responding on September 17th?

A.   Yeah.  And I basically just let him know that I made the request in the actual motion, but I didn't, like, follow-up with the clerk or anything.  That had been the only action I took, was noting it in the motion itself.

Q.   And, in fact, as has already been mentioned today, there was a status conference held on September 26th; is that correct?

A.   That's correct.

Q.   Did you receive a notice from the Court of the setting of the status conference?

A.   Yes, I did.

Q.   Did you communicate that to Hall Booth Smith?

A.   Yes.  I believe I forwarded the Court's notification of the telephonic hearing.

Q.   And as the Court's already noted, you, in fact, attended that conference?

A.   I did.

Q.   There's a transcript out there somewhere.  I have not seen it.  But what's your memory of -- well, number one, you attended.  Was it attended by Hall Booth Smith?

A.   No.

            THE COURT:  Do you want a copy of the transcript?

MR. CHENEY:  No, I'm fine.

THE COURT:  It's Document 142.

MR. CHENEY:  Okay, thank you.

BY MR. CHENEY:

Q.   Do you have an understanding as to the fact that you thought they were going to attend?

A.   I thought they wanted to attend.  I recall discussions about it.  I don't know why they didn't attend.

Q.   You have no knowledge today why they didn't attend?

A.   No.

Q.   And the Court has got the transcript, but from your memory today, was there a discussion about the fact, at the conference, that new counsel you believed were going to be entering into this case?

A.   Yes.  And to clarify, it was my recollection that they were wanting to attend.

Q.   Okay.  So after the conference, the Court grants the motion in essence setting a new trial date; is that correct?

A.   Yes, sir.

Q.   And did you advise Hall Booth Smith of the fact that the motion had been granted?

A.   I did, yes.

Q.   Okay.

A.   And also, I believe I emailed Ms. Valenciano just to kind of give her a, you know, mission accomplished.

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

Q.   At that point, where did you believe you were in terms of this -- oh, let me back up.  There's one thing I neglected to ask you.

In the Motion to Continue, you included dates that would be potentially conflicts for you, correct, professionally?

A.   That's correct, yes.

Q.   If, in fact, you're getting out of this case, so you think -- you've been terminated as counsel for the Defendants -- why did you take that step of including your potential conflicts?

A.   So at that time, I had been terminated by the CorrHealth Defendants and by Aspen, but I was still the only attorney of record for the CorrHealth Defendants at that time, and it was clear to me that there's a universe where the Court says, no, we're going to move forward in November for this trial.  I'm going to deny the motion to continue, this case has been pending for two and a half years in front of me, the trial is going to move forward.  And I also envisioned a scenario where a Motion to Withdraw would not be granted and I would have to stick around.  So at the time I made that filing, I believed my trial calendar was absolutely relevant to the motion.

Q.   Okay.  So let me turn now to -- I think you have maybe in the inner flap of that three-ring binder the Court's Order to Show Cause.

A.   Yes.

Q.    On Page 3 of the Court's Order to Show Cause, at Footnote 2, you ultimately moved to withdraw, correct, on November 5th?

A.    Yes.

Q.    Maybe I should cover that first.  After the Motion to Continue had been granted, what's the next thing that you remember occurring?

A.    So at this time, and now we're talking about the October 2024 timeframe, I was having, you know, pretty regular communications with Hall Booth Smith about remaining items in the file that they needed, and me and my staff were working with them to try to get those missing items.  But after the status conference, I no longer played any substantive role in terms of moving the case forward towards the trial.

Q.    Let me ask you to turn to what would be under Tab 8, which would be Exhibit D to your response to the Order to Show Cause. Does that refresh you on what happened next in terms of your involvement in this matter?

A.    It certainly refreshes my memory as to the withdrawal and how that happened.

Q.    Okay.  And the communication came from whom, Mr. Kannenberg?

A.    That would be Ms. Ah Loy at Hall Booth Smith.

Q.    The email is pretty short, but what does she tell you?

A.    "Can you please get your withdrawal on file today."

Q.   And did you comply?

A.   Yes, we got it on file.

Q.   The Court has taken you to task, properly --

A.   Rightfully so.

Q.   Yes.  You didn't -- unlike doing it the way you should do it with a Motion to Continue, you just filed a Motion to Withdraw?

A.   Right.

Q.   And do you understand that not to be in compliance with the local rules?

A.   The Court is absolutely correct, that is not the correct procedure.

Q.   So you knew what you were doing, basically?

A.   Yes.

Q.   Why did you take that step of simply filing a Motion to Withdraw?

A.   I had a request from Hall Booth Smith to get that on file today.  I wanted to comply with that.  And instead of carefully complying with the rule, like I had done on many filings before, I just kind of hastily got it on file.

Q.   At that point, had Hall Booth Smith entered its appearance?

A.   Yes.

Q.   And Mr. Leonard, or the Plaintiffs' counsel, were aware that new counsel were coming in and you were leaving the case?

A.    That's correct.

Q.    No excuse for not complying with the rules?

A.    Absolutely not.  I'm embarrassed.  I do want to -- because the Show Cause Order references, you know, the timing of the withdrawal, I would like to address that, if I may.

Q.    Sure, please.

A.    The timing of the withdrawal had nothing to do with a conflict that I understood.  It had nothing to do with trying to evade responsibilities to file responses to some motions Plaintiffs had filed.  Frankly, it should have happened earlier.  Maybe a better course would have been for us to coordinate with Hall Booth Smith to do the substitution at the same time.  It would have been nice and clean.  But I got busy with a trial that I had in Federal Court in Iowa in October and so it didn't happen.  And then I get this email on November 5th.  That's why I filed my withdrawal that day and no other reason.

Q.    Okay.  Let's turn now to the Dunton Notice.  You've told us that the case was substantially done, in your mind, and ready for trial by the end of 2023.  We know, and I think the Court has recited, that a Dunton Notice was filed in 2024, and then ultimately the Court entered an order asking you to respond to it.  And you did respond; is that correct?

A.    Yes, I did.

Q.    Okay.  And that is --

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                            22-CV-288

THE COURT:  Mr. Cheney, since you're transitioning into the Dunton Notice and it's 11:30, this probably would be a good time to break.

MR. CHENEY:  Sure.

THE COURT:  So let's break for lunch and resume at 1:30.

MR. CHENEY:  Thank you, Your Honor.

(Recess was held at 11:32 A.M.)

(In Open Court at 1:40 P.M.)

THE COURT:  Please be seated.  Mr. Kannenberg can resume the witness stand.  You may proceed.

MR. CHENEY:  May it please Your Honor.

TESTIMONY OF CASEY COLE KANNENBERG

CONTINUED DIRECT EXAMINATION

BY MR. CHENEY:

Q.   Mr. Kannenberg, I think before we took the break for lunch, I was just about ready to turn to the Response that you prepared in response to the Court's order on the Dunton Notice. I think that's in your book, maybe in one of the pockets there. Do you find that?  I think it may be in the --

A.   Yes, I have it.

Q.   That is the Response you filed with the Court on May 22nd of 2024?

A.   Yes, sir.

Q.   Okay.  What was your intent or purpose, or what were you

trying to accomplish in preparing and filing that Response?

A.    My intention was the Court's instructions to me.  In its order to file a Response, it set forth three categories of issues that it wanted me to address.  So I wanted to kind of hit the nail on the head and address each of those three concerns.  So I've got each of those questions as its own discrete subcategory.  So that was my intention.

Q.    Okay.  And it speaks for itself and I don't want to belabor it, but let me just ask you at the outset and let's work backwards, on receiving the Court's order, did you believe that there existed a conflict of interest between any one of the Defendants whom you were representing up to that point?

A.    No, I did not.

Q.    In your Response, did you endeavor to explain to the Court why, the reasons why that was your conclusion?

A.    I did, you know, in a fair amount of detail, because I thought -- you know, by the time the Dunton Notice came out, the case had already been worked up.  We had already done discovery depositions, experts, and it only became clearer to me as the case progressed that there was no conflict.  It further cemented in my mind that I wanted to just illuminate that to the Court why I didn't believe there was a conflict.

Q.    In fact, when the Dunton Notice was filed and the Court issued its order, the case was, in terms of the case management, scheduling order and whatnot, the case was all done

and simply waiting for a trial setting, right?

A.   That's correct, yes.

Q.   And because this is an important issue to the Court, did you submit this to the individual Defendants that you were representing at the time?

A.   I did not.

Q.   And why not?

A.   Because I did not believe there was a conflict and I did not believe that Plaintiffs filing the Dunton Notice created a conflict.

Q.   Did you submit the Response prior to filing, to CorrHealth?

A.   I did, yes.

Q.   And to whom did you submit it?

A.   I sent it to Mr. Hammond who, again, is the Director of Risk at CorrHealth.

Q.   And this was done before you filed it?

A.   This was before I filed it.

Q.   Okay.  And we have to be careful here now, because otherwise we're going to get into potential attorney-client conversations or communications.  But let me ask you first, did you have discussions with Mr. Hammond regarding this pleading, this proposed or draft pleading?

A.   Yes, I did.

Q.   And did Mr. Hammond, on behalf of -- let me ask you, and I

guess it's clear already, but did you understand Mr. Hammond to be the authorized representative of CorrHealth?

A.   I did.  And he was, yes.

Q.   And did he see a draft of this pleading before you filed it with the Court?

A.   Yes, he did.

Q.   Did he express any concerns about this pleading?

A.   He did not.

MS. BLAKE:  Excuse me, Your Honor.  I'll object to the extent it requires that the witness testify as to what the intent or thought was, or direction from CorrHealth.

MR. CHENEY:  Counsel's correct.  That was a bad question on my part.  I apologize.

THE COURT:  I'll sustain the objection.  You can rephrase the question.

BY MR. CHENEY:

Q.   You had discussions with the client?

A.   Yes.

Q.   Were you authorized to file this pleading?

A.   Yes, I was.

Q.   I'm going to turn now to the -- and I think you have it there.  I'm going to turn to the Court's Order to Show Cause, Page 6 of 8, and down at the paragraph that begins, "The first rule is."  Do you see where I am, Mr. Kannenberg?

A.   Mr. Cheney, can I add something to my previous answer?

Q.    You sure can.

A.    Because I think it's important.  I had written authorization to file the Response, and I believe that is part of the documentation that has been submitted for in camera review.

Q.    Okay, thank you.  Important clarification.  Thank you very much.

     Back to the Order to Show Cause on Page 6, the paragraph that begins with the words, "The first rule," and then down about three lines in that paragraph where the Judge writes: "If attorney Kannenberg had, in fact, not spoken with his clients (the individual Defendants), then the representation and his Response to Plaintiffs' Notice Regarding Potential Dunton Conflict was also false."

     Now, this is the Court stating what the Court states.  Do you agree or disagree with the Court?

A.    I take this very, very seriously, and I respect the Court for its position in this, but I do disagree with that particular statement.

          THE COURT:  Could you, for my reference, again, tell me what page of that document you're reading from?

          MR. CHENEY:  The Court's Order to Show Cause?

          THE COURT:  Right.

          MR. CHENEY:  Page 6, Your Honor.  Down there in the second full paragraph.

THE COURT:  I just wanted to make sure I had it.

BY MR. CHENEY:

Q.   You believed when you filed this, and you had your professional obligations, you believed that what was reflected in the Response to the Dunton Notice was correct and accurate to the best of your belief?

A.   I do believe that, yes.

Q.   And I'm staying on that same page, Mr. Kannenberg, Page 6 of the Court's Order to Show Cause, same paragraph.  I'm going to go down a little further to the sentence that begins, "In fact."  Do you see where I am?  "In fact, attorneys Loy "-- are you with me?  Then I'll read it.

A.   Yes.

Q.   "In fact, attorneys Loy and Hendren assert that attorney Kannenberg's 'representations made in the Response to the Dunton Notice ... are inaccurate."

Do you disagree with the Court's statement there?

A.   I strongly disagree with that.  To explain further --

Q.   Be careful, because we don't want to get into the world of attorney-client privilege.

A.   Right.

Q.   Just so you're mindful of that.

A.   And it goes back to my previous answer, because when they say that the representation was inaccurate, I believe they are referring to the sort of safety net idea that we've been

talking about.  And again, mindful of attorney-client privilege, I was expressly authorized to make that representation.

Q.    And then continuing on where I stopped, again still on Page 6 of the Court's Order to Show Cause, "In the Court's view, attorney Kannenberg's representation that the December trial date worked for all Defendants may constitute a false representation to the Court if the individual Defendants were not even aware of the earlier trial setting or if attorney Kannenberg had not had any contact with the individual Defendants in over two years."

Again, the Court states what the Court states.  In your mind, did you engage in any misrepresentation to this Court in regard to the setting of the -- regarding the December trial date?

A.    I don't believe I did.  I don't believe I made a misrepresentation to the Court.

Q.    Now, it's true you did not submit the Dunton response to the Defendants, and you've explained -- I mean, the individual Defendants.

A.    Correct.

Q.    And you've explained the reasons you didn't?

A.    That's right.

Q.    And the second part, you've said this.  You've explained it.  But it is important to the Court, so I want the Court to

hear you say it maybe one more time.  You had not had contact with the individual Defendants in some time prior to the August 19th order setting the case for trial?

A.   Yes, that's correct.

Q.   And your explanation to the Court -- I mean, they're upset about it, or is upset about it.  Why had you not communicated with the individual Defendants over whatever period of time that was?

A.   I don't know what I can say without getting into attorney-client privileged communications, and stop me if you think I'm going there, but I'm going to try to --

Q.   Well, let me ask you this.  When you got this -- let's call a spade a shovel here.  You litigated this case.  You got down to doing all the discovery, everything was done, the case was wrapped up with a bow on top waiting for a setting.  Was there a reason to talk to the individual Defendants at that point?

A.   I don't believe so.  And I believe I had conversations with them about what the next steps would be, but I don't want to get into that because of attorney-client privilege.

Q.   Had you not been terminated on August 21st, would you have reached out to those Defendants?

A.   Absolutely.  And in my communication to Ms. Day and Mr. Hammond, the last thing I said was, if we don't get a continuance, we need to be ready to go to trial in November,

which means right now we need to start working on this case and getting it ready for trial.

MR. CHENEY:  One second, Your Honor.

BY MR. CHENEY:

Q.    While you have the Order to Show Cause in your hands, the first page, the Court states:  "Given the grave Professional Responsibility concerns at issue, Mr. Casey Kannenberg and Jackson Kelly PLLC should be prepared to discuss attorney discipline."

Would you tell the Court what steps you've taken in regard to attorney discipline here?

A.    As I have told the Court, I take this order and what's in it very seriously, and in response to that directive from the Court, I have self-reported to the New Mexico Disciplinary Counsel, and I have forwarded a copy of that to the other states in which I'm licensed, which would be Colorado and Indiana.

MR. CHENEY:  And under our Rules of Attorney Discipline, Your Honor, those submissions are confidential.  I do have a copy of it.  I will represent to the Court that the self-report simply forwarded to all three disciplinary counsels, or disciplinary counsel offices, the Court's Order to Show Cause.

THE COURT:  I accept your representation.

MR. CHENEY:  Okay.  I did advise them we were having

a hearing today and I would report to them regarding that.

BY MR. CHENEY:

Q.   Anything else you'd like to say to the Court, Mr. Kannenberg?

A.   I'm very sorry that we are here.  I do not believe I made misrepresentations to the Court, but I do apologize to the Court for that.

MR. CHENEY:  At this point, Your Honor, I have no further questions of Mr. Kannenberg.

THE COURT:  Let me ask a couple of questions. Mr. Cheney, do you have a copy of Document 142?

MR. CHENEY:  Yes, Your Honor.

THE COURT:  So I wanted to ask Mr. Kannenberg -- this is the transcript.

MR. CHENEY:  Yes, Your Honor.

THE COURT:  Are you familiar -- do you need a copy of it in front of you, or have you looked at it?

THE WITNESS:  I've looked at it.

MR. CHENEY:  May I approach the witness, Your Honor?

THE COURT:  Sure.  Feel free to go back and forth as you wish.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Now, for my benefit, at the very beginning, we had, of course, Mr. Leonard.  I believe he took the lead.  But if I'm not mistaken, most of the attorneys who

are sitting as Plaintiffs' counsel were at that telephonic scheduling or status conference, and then you were the only one on behalf of the Defendants.

THE WITNESS:  That's correct.

THE COURT:  And again, with the questions I ask, I'm very mindful of the attorney-client privilege, so I'm not asking you to violate that.  But just the way things have shaken out, it strikes me as unusual, if CorrHealth had given you notice that they were -- I don't know if termination is the right word, or changing counsel, but it just strikes me as unusual that you would be the only attorney from the Defendants attending this hearing.  Do you have any thoughts or comments on that?

THE WITNESS:  I believe I used the word awkward before.  I definitely had that sense of tension between my then terminated relationship with the CorrHealth Defendants and my continuing obligations to the Court as the only counsel of record and as the only attorney for the CorrHealth Defendants that appeared at this September 26th status conference.

THE COURT:  Okay.  So to understand your testimony -- well, I'm getting ahead of myself.  Let me go back to this transcript.  All right, I'm on Page 7 in the middle.

THE WITNESS:  Okay.

THE COURT:  You did state in the transcript:  "There is another law firm that is likely" -- likely -- "going to be

appearing for Defendant CorrHealth for purposes of trial."

Again, I'm trying to put myself in your shoes. Before I became a Judge, I handled complex civil litigation, so I know clients oftentimes want to -- for whatever reason, they change lawyers.  But I was trying to think, if I was in your shoes, I've wondered, as this case has evolved, why you did not do something to alert me that you're not going to be at trial on December the 3rd, or that that was not your client's desire for you to be representing them.

Again, I realize I have control over whether or not motions to withdraw are granted, but in other words, why you didn't feel it was necessary to alert me that your client, CorrHealth, or your former client, was looking to change lawyers.  And the reason I say that is because I think I might have done something to make sure the new counsel were on board with the notion that they were to be here on December the 3rd ready to go to trial.

THE WITNESS:  Yes.  You know, I'm reading the words. I was trying my best to signal to the Court where this was going, both in the course of that conference and also in my written submission, as well, that that was coming down the road.  Also mindful that even though we're asking for a continuance, you might not have been inclined to give it or been inclined to allow me to withdraw, even though it had been interpreted.

So I think I'm -- again, this is me trying to walk a fine line and let you know what's going on. And if I, you know, could have said it more artfully or more directly, I apologize.

THE COURT: Well, in complex cases, if a case doesn't, say, settle or get resolved at the dispositive motion stage and it is going to trial, it's not unusual for clients to bring in co-counsel, other lawyers. Oftentimes you get issues over insurance coverage and whatnot where all of a sudden another firm is coming in. Maybe there's an overage. And those are things that, again, are not necessary for the Judge to know. But it happens.

THE WITNESS: Right.

THE COURT: So I guess the point I'm making is that this transcript doesn't reveal anything to me that says CorrHealth doesn't want you to be here as counsel for it and the other Defendants on December the 3rd.

THE WITNESS: It does not say that, Your Honor. I agree.

THE COURT: All right. Now, we talked about -- and I'm not going to belabor this point. But you do agree in terms of your Motion to Withdraw, you didn't comply with the local rule? And you may be aware of this, but there's a reason for that.

In your litigation experience, have you ever had a

pro se party on the other side?

THE WITNESS:  Yes, I have.

THE COURT:  Would you agree it's challenging?

THE WITNESS:  It's very challenging, Your Honor.

THE COURT:  Right.  So part of the rationale behind that rule is if the attorney -- and it could very well be a client is not honoring the fee agreement he has with the attorney.  But part of the reason for the client at least taking a position on it, or having notice of it, is so if the attorney does withdraw and the Court allows it, then, in effect, the clerk's office has a way of getting notice to somebody who is formerly represented who now becomes pro se.

THE WITNESS:  Right.

THE COURT:  You understand that?

THE WITNESS:  Yes, that makes sense.

THE COURT:  Okay.  In terms of what I think you indicated, you didn't believe -- or the Rules of Professional Responsibility, since there were new counsel coming in, prohibited you from contacting individual Defendants.

THE WITNESS:  Correct.

THE COURT:  That puts you in a situation where you are then in conflict with the local rules on a Motion to Withdraw, in determining whether your clients agree to your withdrawal.

THE WITNESS:  Well --

THE COURT:  In other words, was it your testimony that you were just trying to honor the request to get the Motion to Withdraw on file, or did you not feel like you could contact the individual Defendants to determine whether or not they agreed with your withdrawal?

THE WITNESS:  Well, I don't know that this answers your question, but in the context where it's an insurance -- where the defense is provided by an insurance agreement, it's my understanding that the insurance company is the one that retains you, even though you do, in fact, represent the insureds.  But the insurance companies can, and do, make decisions about whether or not you are retained, or whether or not you are terminated.

THE COURT:  Sure.  But isn't your client -- I mean, in this case, even though the insurance company may be paying your bill, your client is CorrHealth and the individual Defendants.  At least that's the state of the pleadings before.  Would you agree with me on that?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Now, in terms of that Dunton Notice, let me just state that your initial filing on that, I'm 100 percent in agreement that there's not a conflict in your response to Plaintiffs' motion based on what was presented in there.  So in the Order to Show Cause, I want to make it very clear, I understand and respect the fact that you are taking it

serious.  But I said, may.

Again, I've got some other matters I have to look through, but when I have a pleading that's filed by you where, to me, it's clear there is no conflict, and I agree with the analysis in there, and then new counsel comes in, would you at least agree with me that for the subsequent firm, that there was a different -- that with the state of the pleadings, there's a different position taken by new counsel on whether or not the Dunton issue is resolved?

THE WITNESS:  And I think --

THE COURT:  In other words, you read what -- because, again, everything in that Order to Show Cause was based on not anything that the Plaintiffs submitted, it's all based on submissions that you made when you were counsel for CorrHealth, and then what new counsel was stating in the pleadings.  So that's where everything is in that Order to Show Cause.

If I'm missing something, let me know, because it just seems like new counsel was taking a position that was either contrary or conflicting to the position that you previously took.

THE WITNESS:  Yes, Your Honor.  And I think I have the answer to that.

THE COURT:  All right.

THE WITNESS:  As I read Paragraph 9 of Submission 138, which I believe was a November 12th filing -- and again,

as I read it, the caveat has to be that once I was terminated, I was no longer having communications with CorrHealth about the conflict issue.  So in Docket 138, Paragraph 9, it's stated that I made a misrepresentation in my Dunton Response, which was that I was not authorized to make the safety net representation.  And I agree with you that there was no challenge to the remainder of that analysis regarding the cohesive defense that we had prepared in litigating the case.

So the problem is -- and honestly, I can't get into attorney-client privileged communications.

THE COURT:  Sure.

THE WITNESS:  The basis for them to conclude that there is now a conflict is that I made an unauthorized representation.  And what I'm saying, and I think the in camera documents will show, is that I, in fact, made an authorized representation.  I think I'm allowed to say that without violating the attorney-client communications.

THE COURT:  No, and I appreciate that, because then that suggests to me it's your testimony that the earlier representation you made on the Dunton Response, you were authorized to make that by your client at that time.

THE WITNESS:  I absolutely was, and I believe the documents show that.

THE COURT:  Okay.  Now, you've been asked about this Footnote No. 1, which is Document 123, Defendant CorrHealth's

Partially Unopposed Motion to Continue and Reset Trial.  Now, you would agree this was filed on September the -- I mean, I can show you.  It was filed on September the 13th, right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  You had already been given notice that CorrHealth wanted to move in another direction in terms of counsel?

THE WITNESS:  That was August 21st, yes.

THE COURT:  Right.  But is it your testimony that you were authorized to file this motion on behalf of the Defendants?

THE WITNESS:  Yes.  I was requested by Hall Booth Smith, and then I received written approval from Aspen to help facilitate this, to help get this taken care of.

THE COURT:  Okay.  And then in Footnote No. 1 -- and you prepared this pleading, right?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And I'm asking this more for my benefit.  It starts out and it says:  "Note that it is anticipated that Defendant CorrHealth will be bringing on new counsel from another law firm."

Now, "anticipate," it's not as definitive as a new law firm is going to try this case.  Was there a particular reason you used the word anticipated?  In other words, was it the fact that I may not let you out?  I'm trying to understand

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

that, because that doesn't convey a clear message to me that Jackson Kelly is out and Hall Booth Smith is in.

THE WITNESS:  What I was trying to do, and apparently not successfully, is let you know that Hall Booth Smith has seen this motion, they approved it, and that they are going to be coming into this case.  And I wanted to reassure you that their ultimate appearance would not cause you to think, well, Mr. Kannenberg just filed a Motion to Continue based on his trial schedule, now there's these new attorneys coming in and we're going to have to go through this whole exercise again and maybe have to reschedule the trial.  So I was trying to do those two things, and my choice of words was not successful in conveying that.

THE COURT:  Okay.  In terms of -- and I can't remember.  This may be a mistake on my part, or this was said in a pleading.  But during the break, I did check, and this was obviously before you went with Jackson Kelly and Jackson Kelly became counsel of record.  But all the Defendants, it looked like, all the individual Defendants were personally served.  There's some kind of an acknowledgment in the pleadings.  Is that your understanding, as well, or your recollection?

THE WITNESS:  So, I don't want to go into attorney-client privilege --

THE COURT:  I guess the point is, I want to make sure I didn't state something wrong.  In other words, the notion --

in terms of argument that there's an individual Defendant that didn't even know he or she had been sued, well, if they got personally served, maybe they forgot about it or thought the case had been resolved.  But if they had all been personally served, then they should know they're a Defendant in a lawsuit.

THE WITNESS:  So I'm looking at my counsel because I really don't want to get into --

THE COURT:  Okay.

THE WITNESS:  There is a written communication that is on point with the exact question you're asking.  I don't know that it's been submitted.

MR. CHENEY:  We did discuss it at lunch, Your Honor.  Candor to the Court is important here, because I think in the Court's introductory comments this morning, there was a question in your mind, and you've just maybe restated it, were the individual Defendants served.  And there is a written communication that answers your question.

THE COURT:  That's fine.

MS. SCHOFIELD:  It's not included in the in camera materials.  If the Court wants, we can amend our privilege log and include that.

THE COURT:  No, that's fine.  I just wanted to -- again, if I made a misrepresentation in terms of that, I don't want to be, you know, guilty of that.

MR. CHENEY:  No, no.

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                              22-CV-288

THE COURT:  Now, you did, in terms of the depositions of the individual Defendants, you defended those depositions?

THE WITNESS:  Well, some.

THE COURT:  Well, either you or somebody from your firm defended those depositions?

THE WITNESS:  Yes.  I defended the depositions of Myra Martinez, Oakley Blasdel, Barry Schooley-Stanford, and there was one other one that I believe I did.

THE COURT:  Now, earlier there was a -- so if you defended them, then obviously you had communication with those individual Defendants.  If you weren't defending, it was somebody, another lawyer at either your former firm or your current firm covering that deposition?

THE WITNESS:  That's correct.

THE COURT:  All right.  Now, you made a reference -- one of the individual Defendants, a Dr. Boynton, was his deposition ever taken?

THE WITNESS:  It was neither requested nor taken.

THE COURT:  Okay.  And again, I don't want to get into any communications you had with Mr. Boynton, but if his deposition -- or Dr. Boynton.  But if his deposition was not taken, do you recall an approximate timeframe when you would have had a conversation with him?  And if you don't, that's fine.

THE WITNESS:  I don't know.  I just know that -- you

know, I've been obviously looking at some of the emails and stuff that are in the file, and I know there were communications between Dr. Boynton and other attorneys in my office at Sharuzi.

THE COURT:  Okay.  Did any other defense counsel have any questions of Mr. Kannenberg?

MR. HENDREN:  Yes, Your Honor.

MR. CHENEY:  Thank you, Your Honor.

THE COURT:  And I'm sorry, I forgot your name and who you represent.

MR. HENDREN:  Yes, Your Honor.  Jason Hendren, and I'm at Hall Booth Smith.

THE COURT:  All right.

MR. HENDREN:  May it please the Court.

THE COURT:  You may proceed.

CROSS-EXAMINATION

BY MR. HENDREN:

Q.   Mr. Kannenberg, just a few questions.

To confirm your previous testimony before the Court, in what you described as your usual work-up of this case, you coordinated telephone conferences and emails with the individual Defendants?  That's what you said on direct.

A.   Well, I looked -- the reason I know that is because in preparing for this, I went back and looked at some of the emails in the file and I did see some emails to and from some

of the individual Defendants about this case.

Q.   Do you stand by your earlier testimony that you also coordinated telephone conferences with the individual Defendants in preparation for the depositions?

A.   The ones that I took, I believe I did coordinate preps with those individuals.

Q.   And then also to confirm, you conducted pre-deposition conferences by Zoom with some or all of the individual Defendants?

A.   I believe I did.

Q.   So you would have had their contact information from the invitations, etc.?

A.   Yes, I believe so.

Q.   But you've had no communications with any of the individual Defendants since approximately March of 2023, correct?

A.   I believe that's correct, yes.

Q.   You testified that Kim Day, with whom you did stay in contact with after March of 2023, in your words terminated your services on August 21st and followed with an email on August 22nd; is that correct?

A.   I believe those are the dates.  I'd have to look.

Q.   Do you still have that email in front of you?

A.   Yes, I do.

        MR. HENDREN:  May I approach, Your Honor?

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

THE COURT: You may.

MS. SCHOFIELD: May I see what you're showing the witness?

MR. HENDREN: For the record, Your Honor, we have a binder, as well, for an in camera review by you.

THE COURT: Okay.

BY MR. HENDREN:

Q.   Did you find it?

A.   I believe so.

MR. HENDREN: Your Honor, I sometimes move around a bit, but I won't if you don't want me to.

THE COURT: I'm sorry? Say that again.

MR. HENDREN: I sometimes move around the courtroom a little bit.

THE COURT: As long as we can -- the biggest issue I have is the inability of the court reporter to hear or me to hear. But you don't need to ask me permission. I usually, unless a witness is intimidated by the attorney, I usually -- but I don't think Mr. Kannenberg is going to be upset if you go and show him something.

MR. HENDREN: I don't think so, Your Honor.

BY MR. HENDREN:

Q.   Let's make sure we're on the same page. It's down there at the bottom.

A.   Yes.

Q.    So the email in question on the 22nd was:  "Per our discussion yesterday, please forward the Erickson file to Alexandra Ah Loy at Hall Booth Smith."  Correct?

A.    Yes, that's what it says.

Q.    So nothing in there about being terminated, transfer the file, put it in a box and take it over there, just forward the file.  That's all this says, correct?

A.    Yeah.  That's what this says, yes.

Q.    And that was per the discussion you had had with her yesterday?

A.    Correct.

Q.    One week later on August 29th, you sent Hall Booth Smith what turned out to be incomplete file materials, correct?

A.    Well, I don't know if that's how I would characterize it. My recollection was that the bulk of the file was there.  Just to beat the punchline, I do acknowledge that there were missing items and that we had spent some time trying to figure that out.

Q.    Would you have any reason to doubt that the materials you transferred to Hall Booth Smith, or forwarded to Hall Booth Smith on August 29th, included four letters from Plaintiffs' counsel, one letter to Magistrate Judge Yarbrough, and one letter from a court reporter?

A.    No, I don't know.

Q.    You don't have any reason to dispute that that's the only

correspondence that was contained in those materials you forwarded, do you?

A.    Yeah, if that's what was forwarded, I wouldn't have any reason to dispute that, because I didn't personally forward the file.

Q.    Okay, as far as correspondence.  But we know from your later pleadings and what has been said here in court today that there were additional communications between you and the clients and others during that same time period that you were on the case, right?

A.    What time period are you taking about?

Q.    From the time you got into it until August 29th, there were more than six pieces of correspondence in your file, correct?

A.    Oh, absolutely, yeah.

Q.    And you did not produce those at that time, did you?

A.    I don't know.

Q.    Sorry?

A.    The answer to your question is, I don't know.

Q.    No reason to dispute that you didn't?

A.    I had an understanding that a significant portion of the file was transferred at the end of August.

Q.    No video or audio recordings, correct?

A.    I think the audio and the video, that stuff I think came in September, if I recall.

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                              22-CV-288

Q.   I'm just talking about August 29th.  You testified to the Court earlier that you were going to try to make this easy for us to get these file materials, but what you sent a week after you had been asked to forward the file you know did not include any of the hours of video recordings, don't you?

A.   Well, you're asking me if I know.  I don't know that.  I don't have a reason to dispute you if you didn't get it, but I don't know that.

Q.   No reason to dispute that you included no reports, no notes, no memos, no contact information for any of the individual Defendants, do you?

A.   See, that's where I'm struggling, because I do believe that emails came over and contained contact information for the individual Defendants, as well as emails that I had authored to and from some of them during the course of my representation.

Q.   Perhaps in your in camera materials, the Judge will be able to find what you sent on August 29th and see what was in there and what was not.  True?

A.   I don't know that we submitted that in camera.

Q.   Okay.  On September 3rd, I emailed you to say that I'd been asked by Ms. Valenciano to "assist" with this case.  Do you remember that?

A.   I think I testified earlier that you and I had some email and phone communications in and around that timeframe, so I would agree that --

Martinez, et al. vs. CorrHealth, et al.            12/10/2024
Order to Show Cause Hearing                        22-CV-288

Q.   And do you remember at that time talking about my partner, Ryan Donihue, who you know?  Correct?

A.   The question is, do I remember us talking about Ryan Donihue?

Q.   Well, yes.

A.   As I sit here today, I don't have a specific memory of talking about Mr. Donihue.

Q.   And the fact that he was not available to try the case in November, but I was.  Do you remember that?

A.   As I sit here, I don't recall that phone conversation.

Q.   You told me at the time that you and Plaintiffs' counsel both had conflicts in October that made the November trial setting disadvantageous, and that you had planned with Plaintiffs' counsel to move for a continuance, correct?

A.   So the request to continue the trial was made by Hall Booth Smith, so I'm a little bit confused by your --

Q.   When we first talked, did you not say that you and Plaintiffs' counsel both had conflicts and planned to move for a continuance of the November trial date?

A.   I don't know that you and I discussed me having a plan to file a continuance.

Q.   You asked if I would provide you dates, if Ms. Ah Loy and I would provide you dates when we could be available to try the case later on, either in December or early in the following year, correct?

A.    Yes, and you provided dates.

Q.    And I promptly responded to you on September 5th and said I can do it in December, I can do it in February, I can do it in March.  Do you remember that?

A.    I do recall an email that said that, yes.

Q.    On September 9th, this is when I think you were having some problems with your phone.  I called you several times and you said, oh, no, I didn't get any messages, I didn't get any of that.  Do you remember that?  You said you were moving offices and having problems with your phones.

A.    I don't recall that conversation.

Q.    Did you move offices at some point in time around then?

A.    We did, yeah.

Q.    Did you have some problems with your phone, had to use your cellphone sometimes instead of your office phone?

A.    I think what I might have told you is that when I work from home, I live in kind of a cellphone dead zone, so it's really tricky for me to make and receive calls from my cellphone, which is why I'm probably one of the few people in this country that have a landline that I make calls from.  But it wouldn't surprise me if you and I had a conversation about me having difficulty with my cellphone.

Q.    On September 10th, do you recall that we had to go to Ms. Valenciano and say that we were having a difficult time contacting you?  Do you remember that?

A.    I don't recall that.

Q.    And then she reached out to you on September 10th, did she not?

A.    Yes.  She emailed me on the 10th, and I think that was the email I testified earlier about where she was authorizing me to assist Hall Booth Smith to the end of obtaining a trial continuance.  Is that the one you're talking about?

      Yes, that's the one.

Q.    And in that email, it was stated:  "Thank you for your help in the hand-off of this file to HBS to ensure CorrHealth continues to receive an adequate/timely defense in connection with the above mentioned matter."  Correct?

A.    Yes, that's what it says.

Q.    Nothing in there about, you're no longer terminated?

A.    I had been terminated on August 21st.

Q.    Well, apparently not based on this email.  You're going to continue to help us with the transition of this file, right, to make sure that this case was ready --

A.    Yes, so that's --

Q.    -- and CorrHealth's interests were protected?  You were going to continue to do that, weren't you?

A.    That's what I understood my role to be, was to help in the orderly transfer of the file so that CorrHealth and the CorrHealth individual Defendants' interests would be adequately represented, and that's what I interpreted Ms. Valenciano was

communicating to me here, which I believe reinforced my conversations with Kim Day.

Q.   And following that email, on that same day -- do you see that one?

A.   Did you say the same day?

Q.   September 10th.

A.   This says September 16th.

Q.   I stand corrected.  You're correct, Mr. Kannenberg.  I apologize.  On September 16th, I emailed you in follow-up to ask if we could get on a conference call with the Court this week about the planned Motion for Continuance, correct?

A.   Yes.  I mean, those aren't the exact words you said in the email, but that's a good paraphrase.

Q.   "Please let me know if we can get on a conference call with the Court this week about the motion."

A.   Yep.

Q.   I read it right?

A.   That's correct, yes.

Q.   Okay.  "Also, please let me know if the defense lay and expert witnesses are aware of the November trial date."  Did I read that correctly, too?

A.   You certainly did.

Q.   And your response to me the following day was:  "Hi, Jason.  Sorry for the delay.  Traveling out of state for final pretrial conference.  I have the request for a conference call

in the motion, but have not made a separate request."

You go on to say:  "I have notified the experts about the trial dates and have heard back from Renee Dahring that she has no conflict.  I have not heard back from Dr. Chiang or Dr. Fox. I also got a bounce-back message from Dr. Fox, so not sure if it even went through.  We should have a paralegal, yours or mine, reach out to him through other means to see what's going on.  Let me know if you want to do that on our end."

Did I read that correctly?

A.    Yes, you did.

Q.    So notwithstanding your ethical concerns about contacting individual Defendants, you had no problem at that point helping us get in touch with these experts who you hadn't talked to in over a year, right?

A.    Well, let me -- I think there's an important clarification there.  When I received this communication from you on September 16th, almost a month after the case had been transferred to you, I must confess, I was a little concerned that you hadn't reached out to the experts yet.

Q.    We didn't have their contact information, Mr. Kannenberg.

A.    I didn't think -- I thought I could help you out by emailing these three experts and facilitating a transfer of communication.

Q.    So you did send us their contact information, didn't you?

A.    I believe I did.

Q.   But even though you had email communications, cellphone conferences, etc. with the individual Defendants, you never sent us any of that, did you?

A.   See, I just don't think that's accurate.

Q.   Well, we'll get to your November 1st email and clarify that.

A.   I'm happy to do so.

Q.   So you think there might be something from earlier where you sent us some of that information?

A.   See, I guess what I'm struggling with here a little bit is at Jackson Kelly, there's a process for transferring the file, right, and I believe that process happened in this case, that a portion of the file went over in August.  And I know that -- I agree with you that over the course of the next month or two, we got you more records.  So since I'm here under oath, I don't know exactly when the emails that you're referencing made it to you, because I know that those emails had contact information for the individual Defendants.

     So I'm just trying to explain why I'm struggling a little bit here with your question, because if you were to tell me, well, we didn't receive these emails until this date, I wouldn't have any reason to disagree with you.  But you're not telling me that.

Q.   Well, you're going to tell the Court in a minute that you never had their contact information, which is not what you told

us earlier.  But we'll get to that.

A.   Well, I never made that --

MS. SCHOFIELD:  I object to counsel repeatedly testifying.  If he could just questions.

THE COURT:  Well, rephrase the question.

MR. HENDREN:  Yes, Your Honor.

BY MR. HENDREN:

Q.   Let me show you -- do you have the September 24th email from my office?

A.   Yes, I have seen this one.

Q.   In this one, we reached out to your paralegal and copied you, I think you saw on there.

A.   I saw that there was an email to my paralegal, and I did see my name on there, yes.

Q.   That you're copied?

A.   Yes.

Q.   Okay.  "Per recent phone call, we've gotten a request from our lead attorney to obtain contact information for those involved with this case.  If you have any contact information for those who were deposed in this matter or any other fact witnesses, please forward that information to us as soon as you can."  And then it lists about 20 or so deponents, correct?

A.   I think that's what -- I don't have -- that's the only copy.  I don't have it in front of me.  But I know what you're talking about.  There's an email that lists people who were

deposed.

Q.   And you do not have a response email from either you or your paralegal because you never responded, did you?

A.   I don't know.

Q.   If you did, it's probably in your binder, do you think?

A.   I don't think that's in my binder, no.

Q.   Do you have the September 26th email in your binder?

A.   I don't believe I have this in my binder.

Q.   Is it copied to you?

A.   It's to Tami Charlson, who is one of the paralegals at Jackson Kelly, and I am in the CC line, yes.

Q.   In that email, my associate said:  "Just wanted to follow up on our prior conversation concerning any contact information you may have for witnesses in the Erickson case."  Do you have a response email from you or Tami to that email in your binder?

A.   I don't know, but it's asking for witness information, right?  Is that what it says?

Q.   Yes.

A.   Okay.

Q.   You don't have one, do you?

A.   In my --

Q.   Because you and your paralegal did not respond, did you?

A.   I know that you're trying to say that because an email isn't in this binder that I have that there wasn't a response. I don't know.  There's not one in this binder.  I don't know if

there's a response.

MR. CHENEY:  For the Court, I think I tried to make it clear this morning, the binder is just -- and I notified counsel -- these might be documents I'll refer to.  It was not to incorporate every email that might have been involved.

BY MR. HENDREN:

Q.   At the September 26th conference with the Court in this case, do you recall that you handled that hearing because you didn't want me to be there and have to admit to the Court that I didn't have a conflict with November?  Do you remember that?

A.   I don't -- I thought -- my recollection of our communications is that you guys were planning on participating in the conference and decided not to at the last minute.  I don't know why.

Q.   Well, we couldn't have, because we hadn't entered an appearance yet, had we?

A.   You had not.  You appeared on the 30th, I believe.

Q.   But because you were still counsel of record, and you and Plaintiffs' counsel had this conflict -- I think yours went away, didn't it, right before the hearing?

A.   It -- no.  The --

Q.   One of yours did, yours or Plaintiffs.  And you were afraid to let the Court know that your conflict with October might be not a conflict anymore.  Do you remember that?

A.   No.  I think I said that there had been a case, that we

had agreed to a number, but the case was still on trial.  There had been no dismissal or anything of that nature.

Q.   So there was a strategic decision on your part that we shouldn't be there, and that's why we hadn't entered an appearance yet, correct?

A.   No, I disagree with that.

Q.   Okay.  But you admit that we weren't counsel of record at that point, and wouldn't be for several days after that, correct?

A.   You were counsel for the CorrHealth Defendants at that time.  I was counsel -- I think there's a distinction here. You were counsel for CorrHealth and the individual Defendants at this time, and I do agree that I was counsel of record at this time.

Q.   Hadn't been terminated?  You were still representing the interests of CorrHealth and the individual Defendants in this courtroom in front of this Judge?

A.   I had been terminated by Aspen, and I stayed on to facilitate transfer of the file and for a specific task that was authorized by Ms. Valenciano.

Q.   And in that hearing on the 26th, you represented to the Court what we've all seen now in the Show Cause Order, and you don't deny that you made those representations to the Court that December would be just fine, right?

A.   December would be fine for Hall Booth Smith, for the

CorrHealth Defendants, and for my schedule, as well.

Q.   Okay.  Well, I'm not going to beat that horse, but I think on Page 3 of the Show Cause Order, it says:  "Yes, Your Honor, that works perfectly," right?  In answer to a question from the Court:  "Does that work for the Defendants," correct?

A.   Yeah.

Q.   So there was no --

A.   And the reason why I felt confident to make that position is because I emailed you on September 12th with a copy of the Motion for Continuance, and I asked you, as counsel for the CorrHealth Defendants:  "Do you have any edits or revisions to anything in this document?"  And the reason I asked you that is because you were counsel for the CorrHealth Defendants.  And when you responded to me and said, "Looks great," I felt that I would be in good standing to make a representation to the Court that you and the CorrHealth Defendants were available for the December 3rd trial setting.

Q.   You felt that somehow your representation was blatantly affirmed by me when I didn't even have contact information for these people?

A.   I don't know that.  You keep saying you didn't have contact information, and I don't know that you didn't.

Q.   Do you have your November 1st email?

A.   Let me take a look at this one.  Yes, I've seen it.  I know about this email.

Q.    In that email to my law partner, Ms. Ah Loy, you say: "Allie, for contact information, I coordinated all deps and individual provider meetings through Mary Zold, CorrHealth Director of Operations, and Tim Hammond, Director of Risk Management.  They would always be my first point of contact and they would contact me with individual providers.  To set up meetings with individual providers, I would send an email to Mary, copying Tim as I did, and they would coordinate any meetings and preps."  Correct?

A.    Yeah.  So what I was trying to do, I was trying to give you an easy way -- you're telling me you need this contact information, which are in the emails that are in the file, but I'm saying, here's an excellent resource.  If you haven't -- it's November 1st, and you've been counsel since August 21st.  If you haven't yet reached out to the Director of Risk Management and the Director of Operations, who is also the Rule 30(b)(6) witness, here is their contact information. I bet they can get you the information you need real quick.

Q.    But not something you sent on September 17th when we asked for it, or any of the other times through September that we asked for that contact information.  Only in November did you share with us that you never had any contact information, which is not what you've told the Court here today.

A.    So on September 16th -- you said September 10th before, and now you've said September 17th.

Q.     The 17th is when you sent me the email back.

A.     On September 16th, you asked for -- if I had contacted lay and defense experts?

Q.     Right.

A.     And I believe the first time -- there's a different email. The first time where you actually asked for contact information for the individual Defendants, that was the November email from Ms. Ah Loy.  If there's a different email that says, what's the contact information for the individual Defendants, you know, show it to me.  I've seen a couple of emails, but I haven't seen --

Q.     On September 24th and 26th, we just looked at them.

A.     It said fact witnesses and list deponents.

Q.     Which includes the individual Defendants, Mr. Kannenberg.

A.     It's the Plaintiffs, it's the Plaintiffs' experts, it's County personnel and CorrHealth medical providers.

Q.     Who are the individual Defendants.  Kimberly Rich-Gainey, for example.

A.     Yeah.  So this email to and from your paralegal to my paralegal.

Q.     Copied to you both times, correct?  Do you want to see it again?

A.     No, I saw my name on there.  I was copied on there.

Q.     With respect to the Dunton Notice, you will have in the in camera materials that you will submit to the Court the exchange

with CorrHealth regarding your analysis and your recommendation with respect to the Dunton Notice, correct?

A.    I wouldn't characterize it like that.

Q.    I wouldn't, either, but I'm just asking you, is there anything in what you're going to give to the Judge that shows what you told CorrHealth about that Dunton Notice?

A.    Yeah, because you used the word "recommendation."  I was asking CorrHealth a question.  But I don't want to talk about that communication, because it's attorney-client privilege.

Q.    Well, as long as the Court can see what it was that you actually communicated to CorrHealth.  Will the Court be able to see that, as far as people not having to give up their homes?  Do you remember that?

A.    So they'll see the written email communication.  I don't -- I had telephonic conferences with CorrHealth regarding the subject.  There's no, like, recordings or transcripts of those phone calls, it's just the email.

Q.    Just the email.  And from that email, the Court will be able to see whether you explained at all the ramifications of what you were going to put in that pleading, in the Dunton Notice response?  The Court will be able to see what you actually said, if anything, about what kind of ramifications that representation would have, especially since you hadn't talked to these other Defendants in over a year, correct?

A.    Well, attached to the email is a draft of my response, and

I highlighted language and I direct -- you're asking me to divulge attorney-client privileged information.

Q.    Well, I just want to know if the Court can look at it and see kind of what they must have been thinking based on what you were saying, about people losing their houses, right?

A.    The Court is going to see --

MS. SCHOFIELD:  I'm a little concerned we're getting into attorney-client privileged communications.

THE COURT:  Well, I haven't looked at it yet, so I would say let's not get into those.  I mean, ultimately I could make a determination whether it's privileged or whether or not the privilege has been waived, but I think I need to look at it first before we go down that road.

BY MR. HENDREN:

Q.    Since you are not willing to talk about the verbal conversations, and all the Judge can see is the written, that would be the best way for the Judge to decide whether there was any kind of an informed consent to your representation on the Dunton Notice?

A.    It's not that I'm not willing, and I think you know that. It's an attorney-client privilege that belongs to CorrHealth. It has nothing to do with willingness.

Q.    It was only on November 1st, 2024, that you admitted that you had not been in touch with these individual Defendants and didn't have the contact information, and we needed to go

through CorrHealth to get it, true?

A.   I didn't do any of those things.  I had been in touch with the individual Defendants, as I testified earlier, throughout the life of the litigation, including written discovery and depositions.

Q.   But not for well over a year, almost two?

A.   I believe I testified that once we got through the depositions, that was kind of the significant part of their heavy involvement in the case, and I did have conversations with them that, again, had nothing to do with willingness, but I can't divulge that.

Q.   And it was only at that time, Mr. Kannenberg, when it became clear that you hadn't had any communications in well over a year, almost two, with these individual Defendants, and it was clear that you had misrepresented to this Court that those Defendants were okay with a December trial setting, that is when we said, yeah, I think you better withdraw, and that's what you did within a day or so after that, true?

A.   No.  So, we have the emails.  The email from November 5th is from Ms. Ah Loy saying, can you have your withdrawal on by the end of the day, and that's why I did it and that's what I did.

Q.   Because we asked you to based on what we were finding out, correct?

A.   I can't speak to what you were finding out.

MR. HENDREN:  Nothing further, Your Honor.

THE COURT:  Any other defense counsel?

MR. RAPPAPORT:  No, Your Honor.

THE COURT:  All right.  Mr. Leonard.

MR. LEONARD:  Just before I begin, if we could get copies of any documents, or at least a log or something of what was shown to the witness today.  I didn't want to interrupt the flow of the testimony.  But just something to move things along, if we could get those at a later time and just get them into the record, if they're not already.

THE COURT:  Well, if something was used to refresh a witness' recollection, it doesn't necessarily have to be of record.  I'm not saying you shouldn't know what it is, but I'm not exactly sure what all was shown to the witness.  I'm not sure whether it's going to be in this material.

MS. AH LOY:  We can get a privilege log.  It is going to be in the materials submitted for in camera review.  We can get a privilege log to all counsel by the end of the day today.

THE COURT:  Okay.  And I'm sorry, you're Ms. Loy?

MS. AH LOY:  Yes.  I'm Ms. Ah Loy.

THE COURT:  Ah Loy, okay.

MR. LEONARD:  I was not aware that someone other than Mr. Kannenberg's counsel was submitting materials for in camera review.  So again, I'm just requesting that some record be made of what's being submitted and what's just being used to refresh

recollection.

THE COURT:  Is there an objections to that request?

MS. AH LOY:  No, Your Honor.  And everything that was being used to refresh recollection will be on the privilege log that is being submitted.

MR. LEONARD:  All right.  And then one other clarifying question is, I'm not -- and this is just for my benefit.  I'm not clear who Mr. Hendren is representing.  My understanding is Ms. Blake is now representing CorrHealth.  So just as far as Mr. Hendren, I'm guessing he's representing the HBS firm, at least in terms of --

THE COURT:  Well, that's a good -- go ahead.

MR. HOLLAND:  This is a good segue for me, Your Honor.

THE COURT:  And I'm sorry, I've forgotten -- you entered your appearance this morning.

MR. HOLLAND:  Chance Holland.  I represented the individual former CorrHealth employees for about eight days.  That's who I am.

THE COURT:  Okay.  So let me ask this before Mr. Leonard questions.  I take it, Mr. Hendren, that if we had gone to trial last week, you and Ms. Ah Loy would have been -- is that right, Ah Loy?

MS. AH LOY:  Ah Loy.

THE COURT:  Okay.  You and Ms. Ah Loy would have been

counsel for CorrHealth?

MR. HENDREN:  Absolutely.  Yes, Your Honor.

THE COURT:  Okay.  Are you still --

MR. HENDREN:  I'm here because you told me to be here.

THE COURT:  Right.  Yes, I'm trying to figure out who's --

MR. HENDREN:  For the record, it's my anniversary today and I'm already going to get tanned, but I'm here because you wanted us to be here.  And that's the only way I'm going to get by with my wife, is saying it's what the Judge told me to do.

THE COURT:  Yes, you can tell her that, then, that I ordered you to be here.

MR. HENDREN:  But what I would say, in all seriousness, Your Honor, is I know that this is a grave affair, and it is, but obviously there were things that you had questions about in your Show Cause Order and we were here to fill in additional information.  We frankly did not think that Mr. Kannenberg would take the stand, honestly, and didn't know we were going to have to cross-examine him.  We did that to kind of flesh out some of the things that I will be telling you later as far as understanding Hall Booth Smith's involvement in the case.

THE COURT:  Now, if the case next year goes to trial,

your firm will not be -- or will, at least as it stands now?

MR. HENDREN:  Well, honestly, Your Honor, that is a point of interest, because I'd love to.  I mean, we're ready to try the case next year.

THE COURT:  I guess that's up to CorrHealth.

MR. HENDREN:  Honestly, we were ready to try the case in December.  As Mr. Holland will explain, the Motion for Continuance was done out of an abundance of caution.  We frankly did not think it was going to be granted.  We were ready to go to trial.  We were getting things ready, we were doing instructions, and we got the Court's order and, therefore, desisted.  But, no, I mean, if you let us back -- I mean, if that comes up, we would be happy to.

THE COURT:  Well, I haven't made any findings that you've got a conflict of interest.  But let me just -- while this is fresh in my mind, let's get this on the record.

You filed Document 138, which was the Motion to Withdraw and the Substitution of Counsel for Defendants Boynton, Schooley-Stanford, Oakley, Rich-Gainey, and Myra Martinez.

MR. HENDREN:  Yes, Your Honor.

THE COURT:  The individual Defendants.

MR. HENDREN:  Just the individual Defendants, yes, sir.

THE COURT:  Right.  And you were authorized to file

this motion?

MR. HENDREN:  Yes, Your Honor.

THE COURT:  Now, I read in Paragraph 9, I think -- would I be correct in saying that in terms of the Dunton concerns, you reached a different legal conclusion?

MR. HENDREN:  Yes, Your Honor.

THE COURT:  And you were calling that to my attention in this motion?

MR. HENDREN:  Yes, Your Honor.

THE COURT:  All right.  Now, in terms of -- again, it's been a long time since I've had this.  I guess maybe this case, or what we're dealing with, could be a perfect law school professional responsibility exam question.  But Mr. Holland is with your firm?

MR. HENDREN:  Yes, Your Honor.

THE COURT:  So you've done the research and determined, and it also recites in Paragraph 17, that the individual Defendants consent to Mr. Holland being their lawyer?

MR. HENDREN:  Yes, Your Honor.

THE COURT:  Have you looked and satisfied yourself that an attorney in the same firm can represent the individual Defendants in this case if there are Dunton --

MR. HENDREN:  Yes -- I'm sorry, Your Honor.

THE COURT:  No, go ahead.

MR. HENDREN:  Again, it's a complicated issue.

THE COURT:  I would agree.

MR. HENDREN:  And to be candid with the Court, as soon as we found out what we found out about what had been represented and what had been understood, and all that, there were efforts very quickly to get substitute counsel involved so we could say, wait a minute, this is a problem, these individuals haven't been talked to in a long time, there's obviously going to be a problem here.  So efforts were made and calls were made to get new attorneys.  The problem was that none of those attorneys were willing to get into the case on behalf of the individual Defendants on such short notice because we were all proceeding as though we were going to trial in December.

Therefore, Mr. Holland talked to the client who had a relationship with him already, CorrHealth and Aspen.  They said, can you do it?  And he said, I think so.  I think we can split -- you know, we'll be ready to go in December.  And so I think that's where the problem was.  And then it turned out that because those individual Defendants didn't know about the trial setting or anything, that led to the Motion for Continuance.

THE COURT:  Well, and I granted it because of my concern about lack of notice to the individual Defendants, aside from the other issues.

MR. HENDREN:  But now, if we worked out the conflict to the Court's satisfaction, I don't have any problem staying involved and going ahead and trying the case.  As Mr. Kannenberg said, it's pretty much ready to go.  There's not a whole lot left to do other than put on the proof.

The question would be, in the event of an adverse verdict and the issues about what was represented in the Dunton Notice, there could be some issues on the back end.  Who knows.

THE COURT:  Sure.  Mr. Holland, did you want to state anything else?

MR. HOLLAND:  Well, Your Honor, I had a couple of questions for Mr. Kannenberg, actually.

THE COURT:  Why don't you go ahead and ask them, because I'd like to get in all the Defendants, and then I'll let Mr. Leonard cross-examine.  And I'll let you cross-examine, as well.

MR. HOLLAND:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. HOLLAND:

Q.   Casey, we've never spoken before, correct?

A.   That's correct.

Q.   You realize that I got involved in this case about November 6th or 7th, but I had no communications with you, right?

A.   That's correct.

Q.   All right.  And I think it's been well established, and I don't need to beat a dead horse, that your last contact with the individual Defendants, the five nurses and the doctor, would have been some time around March of 2023?

A.   I believe that's true.  I guess the caveat there is the witnesses that I defended in their depositions.

Q.   Those depositions took place over the course of two weeks or so, I believe, in late February, early March of 2023?

A.   That's my recollection.

Q.   And then presumedly after those depositions, that day or some time shortly thereafter, there would have been a debriefing with the witnesses, but no communications after those events?

A.   I don't believe so.  I think those were the last ones.

Q.   Okay.  And correct me, but I think I heard you testify in explaining yourself, as to why you have not had any, or had not had any communications after that point, was that there was nothing really to communicate with them about, nothing to report, until the point in time that you were -- and I'm just going to go with how you've described it -- terminated sometime later in the fall of 2024; is that accurate?

A.   Yes.  My only discomfort is that there were those conversations, but I believe that I can't tell you about what we talked about in those conversations.

Q.   Were those conversations with the individual Defendants?

A.   Yes, they were.

Q.   And when did those take place?

A.   Some time shortly after their depositions would have been taken.

Q.   So one way or another, the last conversations you had with any one of the individual Defendants would have been March of 2023?

A.   Yeah.  Those would have been the last, like, in-person conversations.  I don't know if there were emails after that. I don't think there were.  But I don't want to say yes and then there was an email in May 2023.  So I just -- I don't think there were.  I think my last communications were after their depositions.

Q.   Have you taken the time to read the responses of each of the individual Defendants to the Show Cause Order?

A.   Yes.

Q.   Did you see in there that they submitted sworn affidavits?

A.   Yes, I saw that.

Q.   And you saw in there, I presume, and I think probably in some of my own filings where I got statements from them, that not a single one of them could remember having any communications of any kind, any medium, in at least 18 months or so?

A.   The timing sounds correct, from what we're talking about.

Q.   And again, the reason you hadn't communicated with them,

in your words, was there was nothing to report, no reason to be communicating with them, up until the point in time that my law partners, Ms. Ah Loy and Mr. Hendren, stepped in, correct?

A.   Yes.  One of my lawyers can jump up if I'm getting into attorney-client privilege, but from my mind and in my view, once we'd gotten through those depositions, that was the big event.  You know, we'd done discovery, they did their depositions, and that was the end of the sort of part where I needed to bother them, so they could go on with their lives. And I had a communication with them about what the next steps would be.

Q.   And I agree, their depositions -- being a defense lawyer, your client's deposition is probably one of the biggest events that happens in a case.  Would you agree with that?

A.   I would agree.

Q.   And I'm not going to disagree with you on that.  But an equally big event, you'd agree, would be a mediation, right?

A.   Well, yes --

Q.   Mediation is important, isn't it?

A.   It is, but it's unique.  There's some unique facets to it in an insurance case.

Q.   Well, I do insurance law, too, and you'd agree with me that these five individual Defendants were your clients?

A.   Yes, correct.

Q.   And there were claims in this lawsuit of deliberate

indifference, medical negligence and wrongful death against each and every one of these individual Defendants?

A.   That's correct.

Q.   And these were your clients, right?

A.   I believe I just said that, but if I --

Q.   Well, say it again.  Correct?

A.   Okay.  They were my clients, yes.

Q.   And you understood that at this mediation, that you would be appearing along with insurance people, or whoever writes the checks, to negotiate with the Plaintiffs a potential out-of-court settlement in this case, right?

A.   Yes.  There was a process for scheduling this mediation. I don't know that I can talk about the strategy behind that.

Q.   Well, you weren't planning on settling out -- with this insurance coverage, you were not planning on settling out one or more Defendants and leaving less coverage for the other ones, were you, right?

MS. SCHOFIELD:  I'm not sure if counsel is asking him to disclose privileged communications, settlement negotiations.

THE COURT:  Well, I'll instruct the witness, if it's a privileged -- if the answer to the question is a disclosure of attorney-client information, then he doesn't have to answer the question.  So restate the question.

MR. HOLLAND:  I can strike whatever I asked, Your Honor, and I can move on from it.

THE COURT: I understand the point you're making.

BY MR. HOLLAND:

Q. The fact of the matter is that mediation was an opportunity for you to try to negotiate a settlement, a resolution, a release of the claims against each of your five individual clients. True?

A. True.

Q. And again, that mediation happened at a time after they gave their depositions, right?

A. Sir, I'm not sure that this is -- and the Court can instruct me to answer, if it will, but this is a Show Cause hearing. I've read the Show Cause Notice. I don't know that it's my job to answer your questions about things that are unrelated to the Show Cause Order. If the Court wants me to answer the question --

Q. Mr. Kannenberg, I'm just asking you about your communications with my former clients, your former clients, and the bottom line is that the mediation setting was not communicated to any one of those five individual Defendants. True?

A. To be honest, I don't know if that's true.

Q. They didn't appear for it, did they?

A. The first mediation was in September of 2023. I was at Sharuzi Law Group at the time. I was one of the attorneys working on the file. So I can't speak for whether someone, or

Ms. Sharuzi, or the associate on that case, or if anyone at CorrHealth, or if my paralegal or assistant at Sharuzi, I can't speak for if anybody in that office had a communication. They may have. I don't know.

Q.   You didn't, though?

A.   I don't think I personally did. I don't recall.

Q.   And was there a second mediation or a settlement conference in 2024?

A.   It was a continued mediation of the first one.

Q.   And when did that happen, roughly?

A.   May of 2024.

Q.   Okay. You didn't communicate that to any of the individual Defendants, either?

A.   I don't think I personally did.

Q.   And those were your clients?

A.   Again --

Q.   Still your clients as of May 2024. True?

A.   Yeah, I agree with you on that.

Q.   Okay. And just so I'm clear on kind of the position that you're taking here, your testimony is that after steps were being taken that you became aware of -- I'm not going to use the word terminated, because I think that's confusing and has an air of finality to it, when obviously I think we've established you were still active and expected to do things on the case. So I'm just going to say, when the decision was made

to pull the file from you, your position is that at that point in time, ethically you couldn't contact any of these individual Defendants?

A.    That was -- so from the moment that I had a phone call with Kim Day on August 21st, that was my understanding, that I was no longer the attorney for the CorrHealth Defendants.

Q.    Is it your position that it would have been unethical for you at that point in time to have any further communications with your clients, the individual Defendants?

A.    Correct.  I didn't have communications with Tim Hammond at CorrHealth or --

Q.    That's not my question.  My question is, is it your position that you believed you would be violating the Rules of Professional Responsibility, or some ethical guideline, by any further communications with the five individual Defendants whom you were still representing and an attorney on the record for? That's your position that you're taking?

A.    I believe it would have been inappropriate for me to contact someone else's clients, because at that point Hall Booth Smith were the attorneys for these individuals.

Q.    I'm still trying to understand where you're going with that.  That doesn't make sense to me.

     Just to help me understand it, I think you saw in some of the briefing that you've reviewed from the individual Defendants and their responses to the Show Cause Order that I

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                             22-CV-288

contacted them November 15th, which would have been the day after I was disqualified as counsel from this case.  Did you see that?

A.    I don't recall seeing that.

Q.    Well, if they represented there, and that is, in fact, true, that I communicated with the individual Defendants to -- and I'm going to paraphrase -- let them know that I've been disqualified and I can't be their lawyer anymore, was I violating an ethical rule?

A.    Honestly, I'm not trying to pass judgment or say what is true.  All I can tell you was at that time, when I believed I was terminated, it would have been inappropriate for me to have any further contact with any of the CorrHealth Defendants, whether that interpretation is right or wrong.  I'm not trying to suggest you did something inappropriate, I'm just trying to tell you what I felt on August 21st.

Q.    Okay.  And am I correct in hearing you that when you would have communications with your clients, the individual Defendants, those were exclusively set up and facilitated through your point of contact at CorrHealth?

A.    No.  I think -- you might be interpreting that email differently.

Q.    I haven't read any of the emails.

A.    Okay.  When I first made our entree to the individual Defendants, Tim Hammond and Mary Zold were instrumental in

facilitating those communications, because they had -- I don't know if I'm getting into attorney-client stuff here, but they facilitated the connection.

Q.   You've never at any point in time had the personal telephone numbers for any of the five individual Defendants, have you?

A.   I think I've seen their numbers in the emails.

Q.   You don't have it in your phone?

A.   No, I don't.

Q.   And when Ms. Ah Loy or Mr. Hendren asked for contact information, you certainly didn't pass along any telephone numbers by which they, or myself on down the road, could reach any one of the individual Defendants?

A.   Yeah, I was pretty frustrated when I got that email, because the emails with the contact information are in the file they received.  So I was a little confused as to why they were continuing to ask me for contact information.

Q.   But you sent over emails, right?  They were their CorrHealth work emails.  Do you remember that?

A.   Whose emails?

Q.   The five individual Defendants.  They had CorrHealth emails from the time of their employment at CorrHealth?

A.   I believe so.

Q.   Yeah.  You were aware, though, that -- or maybe you weren't aware -- that none of those five individual Defendants,

by this fall of 2024, were employed at CorrHealth anymore?

A.    Yeah, there were --

Q.    So is it your testimony that the only contact --

A.    Can you --

Q.    -- information that you potentially --

THE COURT:  Just a second.  You're both talking at the same time.  Restate the question.

BY MR. HOLLAND:

Q.    Was it your understanding that the only contact information that you potentially had for any one of the individual Defendants would have been a CorrHealth work-related email address?

A.    No, I don't think so.  I think there were also telephone numbers in the email file.

Q.    Why didn't you pass on telephone numbers to Ms. Ah Loy and Mr. Hendren?

A.    Because they were in the file that we transferred to them.

Q.    Are you sure?

A.    No.

Q.    Okay.

A.    I believe they were transferred.  As I sit here today, I don't know for 100 percent sure.

Q.    You weren't aware this fall, as of this last fall, whenever this file transfer was happening, you weren't even aware, were you, that any one of the five individual

Defendants -- and I'll represent to you none of them worked at CorrHealth anymore -- you weren't aware of that fact, that they were no longer employed at CorrHealth, were you?

A.   Some of them were former Defendants at the time of their depositions.  Some of them were former CorrHealth employees even at the time of their depositions.

Q.   And to your knowledge, you had no emails other than CorrHealth emails, right?

A.   To my knowledge.

Q.   And you think that there would have been phone numbers in the file materials transferred over to Ms. Ah Loy and Mr. Hendren, but you can't swear to it?

A.   Yeah, that's --

Q.   Is that correct?

A.   That's just my understanding.

MR. HOLLAND:  Your Honor, that's all the questions I have.  Did you want me to, I guess, say whatever piece I have while I'm up here?

THE COURT:  Sure.

MR. HOLLAND:  The only thing germane, I think, that hasn't already been belabored is if the Court wanted to see, I did mention that in my materials I've got written Waivers of Conflict of Interest signed by each of these folks before I undertook representation.  I can show them to you.

THE COURT:  I accept your representation.

MR. HOLLAND:  Okay.

THE COURT:  Let's take a real short restroom break, and then we'll come back.  And then, Mr. Leonard, you can question.

(Recess was held at 3:07 P.M.)

(In Open Court at 3:21 P.M.)

THE COURT:  Please be seated.  All right, Mr. Leonard, go ahead.

MS. BLAKE:  Your Honor, Michelle Blake.  I just have a couple of questions.

THE COURT:  Oh, sure.  Let's go ahead and finish it all.  I'm sorry, I didn't mean to cut anyone off.

MS. BLAKE:  No, I didn't make it clear to the Court that I intended to do so earlier.  Thank you.

THE COURT:  Okay.

MS. BLAKE:  For the Court's record, I represent CorrHealth.

THE COURT:  And are you general -- were you introduced as general counsel for CorrHealth?

MS. BLAKE:  With me in the courtroom today is Robert Davis, who is general counsel for CorrHealth.  And I have been retained in the normal course through the carrier, etc.

THE COURT:  Okay.

MS. BLAKE:  Thank you.

CROSS-EXAMINATION

BY MS. BLAKE:

Q.   Sir, I understand your previous testimony to be that there was written communication between yourself and Mr. Hammond regarding your response to the Dunton Notice; is that correct?

A.   Yes, that's correct.

Q.   Were there other communications with Mr. Hammond regarding the Dunton Notice that were not reduced to writing?

A.   I think I -- I don't want to get into the --

Q.   In general, just "yes" or "no."  And when, if you recall.

A.   Yes, and I don't have a specific date, but I believe a general timeframe.

Q.   Do you recall at this point whether the communications with Mr. Hammond were, when I say not written, over the phone? Over Zoom?

A.   My recollection is by phone.

Q.   By phone.  Do you recall whether there was one or more than one, regarding the response to the Dunton Notice?

A.   I don't recall if there was more than one.

Q.   Did you have communications with anyone else besides Mr. Hammond at CorrHealth regarding the response to the Dunton Notice?

A.   No, I did not.

Q.   Thank you.

        MS. BLAKE:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Leonard.

CROSS-EXAMINATION

BY MR. LEONARD:

Q.   Good afternoon, Mr. Kannenberg.  Sir, you and I have met before; is that correct?

A.   We certainly have.

Q.   And we greeted each other when we came into the courtroom this morning before the hearing?

A.   Warmly, yes.

Q.   And our communications -- I think the last time I had spoken with you was at the status conference on September 26th. Do you recollect differently?

A.   That was probably it.

Q.   Okay.  And I haven't spoken with you since that time, or around that timeframe?

A.   I don't think so.

Q.   So in terms of your preparing for your testimony today, you had no communications with me about that?

A.   No, we have not.

Q.   During the time that you were -- before your representation was terminated, as you stated, in August of this year, how would you describe our professional relationship, our communications?

A.   I have a great deal of respect for you as an attorney.  I enjoyed working as your, quote-unquote, adversary.  I thought

that our communications were collegial and professional.

Q.   All right.  Do you recall there were some occasions where we had difficulty getting in touch with each other and you told me about your home phone problems and how you used a landline?

A.   Yes, I probably -- I had that conversation with a lot of people, so it would not surprise me if I had it with you, as well.

Q.   Okay.  And so do you recall any conversations where I reached you on your landline?

A.   I wouldn't be surprised if we had that happen.

Q.   Do you recall any occasions where we yelled at each other, raised our voices, had that type of exchange?

A.   I don't think so.  I think we've -- like I said, for my part, it was a pleasure to have you as an opposing attorney.

Q.   So whatever the problem that we're talking about today in the Order to Show Cause, it's not a personality conflict between you and me?  You wouldn't describe it that way?

A.   I would hope not.

Q.   And how about the Hall Booth Smith attorneys?  I'm using the abbreviation HBS.  I don't know if they have another preferred abbreviation.  Before you were contacted about this case, had you had any other prior communications with attorneys from that firm?

A.   I don't believe I have.

Q.   Okay.  So before the dispute we talked about earlier where

there were emails back and forth between you and Mr. Hendren, you had not had any -- he was not an attorney that you knew of before that time?

A.   I did not, no.

Q.   And how about Ms. Ah Loy?  Is that someone that you'd ever had communications with before this case?

A.   No, I have not.

Q.   Any knowledge about -- did you even know that the HBS firm existed before that time?

A.   I think the name rang a bell, but I didn't -- I certainly didn't have any intimate knowledge about the law firm.

Q.   Okay.  And you're aware that HBS has different offices throughout the country?

A.   Yeah, I think I did know that.

Q.   And then similarly, the firm where you work now, Jackson Kelly, also has offices -- they started out in West Virginia, but now they're in various locations?

A.   Yes.  I think my office is the western outpost.

Q.   Okay.  Would you describe the HBS firm as a market competitor for the Jackson Kelly firm?

A.   You know, I don't think so.

Q.   Different -- you're not competing for the same practice areas, generally?

A.   I don't think we are, no.

Q.   Okay.  Next I'm going to ask some questions about your

communications with your clients, and particularly the individual Defendants.  But before that, I want to give a heads up to your attorneys, as well as the other attorneys in the room, so that you pause to let them interpose an objection.  Because I need to ask my questions just to make a record, and I understand there may be some privilege claims.

A.    Understood.

Q.    So in terms of communicating with CorrHealth, Mr. Hammond, that's someone that you communicated with throughout the litigation until your representation -- at least until your representation was terminated?

A.    Yes.

Q.    Okay.  So you communicated with Mr. Hammond after the deposition period in March of 2023?

A.    Regularly.

Q.    And Mr. Hammond was a person who attended the mediation, the first mediation?

A.    Yes.

Q.    And the second mediation?

A.    Yes, as well.

Q.    And then Mary Zold, who served as the 30(b)(6) representative, and I'm not sure what her title is at CorrHealth, any communications with her after March of 2023?

A.    Probably.

Q.    Okay.  And this is where I think your counsel is going to

want to interject an objection, but if I were to ask you to detail the content of each of your communications, starting with Mr. Hammond, that's something that you or your counsel would want to assert a privilege for; is that correct?

MR. CHENEY:  You understand, the privilege is not yours, it's your client's?

THE WITNESS:  That's correct.

MR. CHENEY:  If you feel that this is going to -- that you're going to be asked to have to reveal communications that you believe to be attorney-client privilege, I think you'll have to make your own professional decision, but I would say that you're probably not at liberty to disclose those communications.

A.   I happen to agree with what was said, so I'm not going to answer the question.

BY MR. LEONARD:

Q.   Right.  So just to move things along --

THE COURT:  Well, let me just interject something. CorrHealth has not authorized you to disclose any communications that would otherwise be protected under the attorney-client communication; is that right?

THE WITNESS:  That's right, Your Honor.

BY MR. LEONARD:

Q.   And so the same answer if I asked you to detail every communication you had with Mary Zold throughout the course of

your representation until you were terminated?  That's something you would assert a privilege for?

A.   Yes, I would.

Q.   And then if we get to the individual Defendants, the five individual Defendants, I think we've already covered that in terms of when a particular relevant communication occurred. But if I were to ask you to detail, for example, how you debrief a client after a deposition, or how you prepare them for a deposition, those types of questions, that would be something where you would assert a privilege?

A.   That's correct.

Q.   All right.  And again, just for my client's perspective, I have to ask those questions to make a record, and then we can sort that out later once the Court has had a chance to perform the in camera review of documents that are submitted.

Now, you can only speak as far as your own communications with a particular client, whether it's an individual defendant or a CorrHealth representative; is that correct?

A.   I guess I'm confused.  Are you asking me, could I potentially speak about attorney-client communications between the individual Defendants and another attorney, like in my office?

Q.   I guess, yeah, let me withdraw that question and rephrase it, then.

So you know there were others in your office --

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

Ms. Sharuzi, a paralegal, an associate -- who may have had contact with one or more of the Defendants during the course of the Sharuzi firm's representation; is that correct?

A.    Yes.   I think there were two associates, Ms. Sharuzi, and our staff, which would include paralegals and legal assistants.

Q.    But you wouldn't be able to testify based on personal knowledge how many of those communications there were from other people within the Sharuzi firm, or the content of those communications?

A.    It's correct that I would not be able to testify to that.

Q.    Okay.  And then how about -- you mentioned about how Mr. Hammond and Ms. Zold would help you facilitate communications with the individual Defendants.  But you were not party to Mr. Hammond's or Ms. Zold's communications with any of those individual Defendants?  You don't have personal knowledge of those?

A.    I can't say for certain, because I don't know if, for example, one of those individuals who was connecting somebody in our office to one of those individuals, if they had, like, copied or CC'd us on that.  So I guess I'm saying I'm not sure.

Q.    So it could be that, say, there's an email string where Ms. Zold had forwarded an email to you that she had received from one of the individual Defendants?  It's a possibility that could happen?

A.    It wouldn't surprise me if that had happened.

Q.   But generally, if they had communications that were not an email or something that was documented, just a phone call or something, you wouldn't have personal knowledge of how many times each individual Defendant talked with Ms. Zold or Mr. Hammond?

A.   That's correct.

Q.   And then how about people at the Jackson Kelly firm?  Was there anyone else besides you, like a paralegal or an associate, anyone that was working on this case while you were at Jackson Kelly?

A.   It would have been myself and one or more paralegals.

Q.   Okay.  And then, do you have any personal knowledge of communications that any of your paralegals at Jackson Kelly might have had with, basically, any of the Defendants?

A.   If they had such communications, I would anticipate that I would have been copied.  But as I sit here, I don't know if any such communications occurred.

Q.   All right.  So again, as we mentioned with CorrHealth, if someone forwarded you an email -- if it was a written communication, you would expect that communication to be forwarded to you?

A.   Yeah, I guess.  Yes.

Q.   But as far as if someone called on the phone, you wouldn't necessarily have any personal knowledge of what your paralegal had spoken with any of the Defendants about?

A.    That's fair.

Q.    Okay.  And then, was there ever an occasion where you refused to speak with any of your clients?

A.    I don't believe so.  When you say refuse --

Q.    I mean, an occasion where you were aware that an individual Defendant had called and left a message for your paralegal, and you decided, no, let's not call that person back.

A.    Oh, I don't think I've ever made that determination.

Q.    Or an occasion where any defendant called you and spoke with you, and then you refused to speak with them and hung up the phone.

A.    No, I don't believe that ever occurred.

Q.    Okay.  And the communications with the insurer, was that always with Aspen being the insurer throughout your representation?

A.    I believe so.  I recall that Kim Day was the representative for most of the life that I was involved.  I do remember that there was another claims representative early on, but then at some point it was transitioned to Kim Day.

Q.    Okay.  And was that other representative for a different insurer, or was it for Aspen?

A.    My recollection is that it was Aspen.

Q.    Okay.  And then you're aware that in CorrHealth's initial disclosures, CorrHealth disclosed a Certificate of Insurance

from a different insurance company other than Aspen?

A.    There was a MedChoice policy that I'm aware of.

Q.    All right.  Were you ever in contact with someone, a representative from MedChoice, during your part of the representation?

A.    I don't think so, and here's why.  When CorrHealth and the Martinez case came over to Ms. Sharuzi's law firm, we had, I guess inherited is the word, the case from a different law firm, Lewis Brisbois, who had handled the case I think largely when it was in the state court level.  My understanding was that at that time, MedChoice may have been the carrier, and then at some point it was transitioned to Aspen.

Q.    All right.  But do you have an explanation as to why the Certificate of Insurance for the MedChoice policy was included with the initial disclosures if you were no longer defending through MedChoice?

A.    And here's where -- my recollection is that the initial disclosures were made by Lewis Brisbois.  I think that's my understanding of the initial disclosures.  By the time we were brought the case, we were approaching kind of the written discovery phase.  But if you were to say that's not the way of it -- it's just that my recollection was that Lewis Brisbois did the initial disclosures.

Q.    And then it's also possible that Ms. Sharuzi or someone else from the Sharuzi law firm could have handled that part of

the initial disclosures?

A.    Correct.  I just don't have a memory or recollection.

Q.    But just getting back to the communications with the clients, it's of record that each individual Defendant answered written discovery, correct?

A.    I believe so, yes.

Q.    And again, to make our record as far as if any of this is privileged, someone from the Sharuzi firm would have been communicating with each of the five individual Defendants in terms of how to answer their written discovery?

A.    Yes.  And I know I was personally involved in at least some of those.  But the answer to your question is, yes. Someone, one of the attorneys at Sharuzi, and probably support personnel, would have been in contact with them.

Q.    All right.  And then as far as, I think, the issue of your communications after you say you were terminated in August of 2024, that has already been covered in prior questioning, but I just have one follow-up on that.  You're aware that we worked on a pretrial order in this case?

A.    I think in the June timeframe, I recall.

Q.    Yes.  In the pretrial order, at least as far as nonparty witnesses, we listed contact information for nonparty witnesses, like the county people, in that pretrial order, correct?

A.    Now that you mention it, yes, I believe we did.

Q.   So apart from witnesses that are listed as care of a counsel, the pretrial order is a logical place to look for nonparty witness information?

A.   I would have to agree with that.

Q.   All right, let me just check with my co-counsel briefly. And I promise we won't have multiple attorneys.

A.   Okay.

MR. LEONARD:  No further questions.

THE COURT:  Is there any redirect of the witness?

MS. SCHOFIELD:  Your Honor, I don't know if there's redirect, but I would like to seek some guidance.

THE COURT:  Well, first, Mr. Cheney is representing Mr. Kannenberg personally, right?

MS. SCHOFIELD:  No, we are both.

THE COURT:  Both, okay.

MS. SCHOFIELD:  We're both.  I don't know, because they are privileged communications, and I'm trying to -- I think some of the questions asked of Mr. Kannenberg, specifically by the Hall Booth Smith people, misrepresent some of the communications.  For example, I have the communication with the contact information, which was represented that it only had CorrHealth addresses, but it's simply not true.  It has personnel email and phone numbers.

THE COURT:  Do you want to submit some in camera material?

MS. SCHOFIELD:  Yes.  I'm trying to figure out how I can supplement my in camera material, just because, again, I think these exhibits have been misrepresented.  I'd like to submit them just so Your Honor can see what was included in the file, because that's been a focus here today.

MR. HOLLAND:  I'd like a copy of that, too.

MR. HENDREN:  I'd love to see this.

MS. SCHOFIELD:  I think it's referenced in the briefing, Your Honor.  They reference the communications that were in there.  But I'm certainly happy to --

THE COURT:  Well, I'm trying to think.  At this point, because the Hall Booth Smith firm represents CorrHealth --

MS. SCHOFIELD:  Well, I don't know that they do represent CorrHealth, Your Honor.  I'm not sure what their status is.  And frankly, the answer didn't clarify it much for me.  If they are not representing CorrHealth, I don't want to produce additional privileged communications to them.  I'm happy to produce them to Ms. Blake, but they do contain, like I said, they contain a discussion early on --

THE COURT:  Well, it would be up to Ms. Blake as counsel for CorrHealth to determine whether, I guess, the privilege should be asserted.  At this point, the privilege has been asserted for anything that's otherwise attorney-client communication, right?

MS. BLAKE:  Correct, Your Honor.  And we would request that the privilege be maintained until the Court orders otherwise.

THE COURT:  Right.  So the privilege extends to communications from former counsel, as well as current counsel, right?

MS. BLAKE:  I agree with you.

THE COURT:  So in other words, if Hall Booth Smith -- let me ask this.  Does Mr. Kannenberg need to stay on the witness stand?

MS. SCHOFIELD:  I do not believe he does.  No, I'm sure Mr. Kannenberg would like to leave the witness stand.

I'm trying to figure out, how do I ensure that I have a complete record before Your Honor?  Because, again, I am concerned that there's been some misrepresentations in terms of the contact information that was provided.

THE COURT:  You are going to do a privilege log, right?

MS. SCHOFIELD:  I'm happy to, yes.

THE COURT:  I think we need to do that.

MS. SCHOFIELD:  And I can redact it.

THE COURT:  And I'll allow Hall Booth Smith to do a privilege log and then submit for in camera.  I guess that's the easiest -- to me, that's the path of least resistance here.

MS. SCHOFIELD:  Thank you, Your Honor.  And then I

will not have that privilege log, obviously, here today, but if I can just provide it to the Court by tomorrow with the additional documents.

THE COURT:  That's fine.

MS. SCHOFIELD:  Thank you, Your Honor.

THE COURT:  In terms of the presentations today, did I leave out anybody -- go ahead.

MS. BLAKE:  I'm sorry to interrupt you.  I was just going to ask a housekeeping question regarding the privilege logs.  Obviously I don't know what's going to be presented in camera.  Would the Court permit CorrHealth, through me, some opportunity to respond to the information that's presented to the Court with either additional information or some further request for evidence down the road, before the Court makes a ruling on the issue that's before the Court today on attorney fees and default judgment?

I'm concerned that CorrHealth's position in responding to all this information that's being represented as privileged is not going to be heard unless we have an opportunity to view it either through responsive pleading or, again, perhaps another hearing.

THE COURT:  What's the response to the request from counsel?

MS. SCHOFIELD:  If you're looking for my response, Your Honor, I frankly think it would be appropriate for -- I

guess, frankly, Your Honor, my concern is that because we don't know what Hall Booth Smith's current status is, if they're purporting to still represent them or not -- some of the briefing, frankly, that's been filed by Hall Booth Smith raises questions.  They've taken positions that I think are contrary to maybe some interests in this room.  So I don't know, but I do think it would be appropriate to --

THE COURT:  As I understand hall Booth Smith's position, again, if Hall Booth Smith is CorrHealth's counsel of choice, then they would remain in this case unless they've got a conflict.  I mean, is that an accurate assessment?

MS. BLAKE:  Well, perhaps I'm speaking out of turn. The best possible scenario, as far as I'm concerned, in representing CorrHealth would be to have a clean break.  Let's decide our past issues, and let's decide our issues moving forward.  And defending the default judgment issue against CorrHealth would be my responsibility.

THE COURT:  Fair enough.

MS. BLAKE:  But I don't know if that is, frankly, CorrHealth's position.  I would have to have an opportunity to speak with my client.  And I don't know what prior counsel's position would be.  But I think that would be the cleanest approach.

THE COURT:  Because the other thing that strikes me is, granted, there's not been a waiver of the attorney-client

communication, but potentially the interests of CorrHealth and the interests of Mr. Kannenberg and/or the Jackson Kelly firm may be adverse.

MS. BLAKE:  They may be.

THE COURT:  And I guess in terms of Mr. Kannenberg and the Jackson Kelly firm, is there anything else that needs to be stated on the record for today's hearing?  And I know you're representing Mr. Kannenberg --

MS. SCHOFIELD:  And Jackson Kelly, Your Honor.

THE COURT:  And Jackson Kelly.

MS. SCHOFIELD:  Yes, Your Honor.  Mr. Cheney and I represent them both.

THE COURT:  Okay.

MS. SCHOFIELD:  I do have some additional arguments I would like to make in terms of the cross-examination of Mr. Kannenberg.  I can make those.  Again, some of it will relate to the additional privilege materials, although I can keep it brief, if Your Honor would be willing to allow me.

THE COURT:  Sure.  Maybe it would make sense for you to talk to your general counsel and we can get that issue resolved.

Now, one thing.  This is -- at first, I will admit that initially when I saw Hall Booth Smith's Motion for Continuance, I was a bit perturbed.  But I will state that I do appreciate that this conflict issue was fleshed out and I was

alerted to it, because, again, I haven't looked at the stuff coming in in camera, and it may very well be that as this case started, there really weren't Dunton issues, but clearly Hall Booth Smith brought to my attention that we've got some significant Dunton issues.  So I appreciate that.

The other thing we haven't talked about -- and again, this goes back to the days when it used to be out-of-state lawyers would get local counsel.  But the reason the week of December 3rd was really appealing to me is because I could get this case tried.

It's interesting, the Hall Booth Smith lawyers are from Oklahoma City.  I've sat over there.  Earlier this year, I went to both Tulsa and Muskogee, and the case I tried in Tulsa, it was a 2017 slip and fall case that came into Federal Court on diversity during the March Madness Tournament that was held at the BOK Center.  But because of the McGirt case, the judges simply couldn't get to it.  And then you had a Judge in Tulsa who had to take a medical retirement.  They were so desperate, they just told judges, look on that judges docket and take whatever cases you want.

So I took some.  I had my law clerks look at it, and I told them, I will not do another oil and gas royalty case, and I'm not going to do another Endangered Species Act case, but I did take that case.  And it was really unfortunate that it took that long.  And the reason I wanted to help them out is

because during President Trump's first administration, there were three -- there are seven active judges for this District, and we had three vacancies and we had a surge in border cases. So civil cases just couldn't get tried.

So one of the reasons that this December -- and again, I'm going back to the August timeframe. I'm not trying to get political on this, but it's a fact that the Biden administration, I think it's safe to say, did not prioritize the border-related cases. So that's why I've got a colleague this week over in Muskogee trying a criminal case and it's why I've helped out the Eastern and Northern Districts, and that's why we committed a law clerk full-time to helping out the Northern District of Oklahoma, because they helped us out when we were dealing with a huge surge of cases right before the pandemic.

So the landscape is going to change come January 20th for the District of New Mexico's criminal caseload, particularly in Las Cruces. There's going to be a surge in cases. That means when you've got someone incarcerated and their liberty interests are at stake, those cases take priority.

So I've got this civil case, and I don't know when I'm going to be able to get it tried. For the defense lawyers, who typically get paid on an hourly basis, they're going to get paid. If Plaintiffs' counsel took it on a contingency fee, the

old saying Justice Delayed Is Justice Denied, that comes into play. So the case, it's been represented, is ready to be tried, but at this point, I don't know -- and Ms. Bhalla, maybe she does criminal defense work. But I've also got a number of complex criminal cases that are set that I'm trying to get tried.

The other thing is, and this is no secret, because the Albuquerque Journal -- Chief Judges, by statute, their terms are limited to seven years. So my seven-year term comes up in January, and seven years is really long enough. But I've also decided, you know, counting my State time and this, I'm 30 years doing this, and I'm going to take senior status, but I don't know how much longer I'm going to hang around. At least I'll be around through the end of the fiscal year, but I may decide I want to do something else. So that means if this case doesn't get resolved, then one of my colleagues is going to get it, and that tends to work a hardship on the Plaintiffs. So that's one of the reasons that I was really, really irritated that we didn't get this case tried, because I wanted to get it resolved.

So I'll sort through this, we'll figure out how to do it, but I would encourage all the parties to maybe make a run at trying to settle this. If you do go to mediation -- and Judge Yarbrough, he's a phenomenal mediator. But I will say this. Particularly with the individual Defendants, if you do

go to mediation, they need to be represented.  Because, again, and I feel strongly about this, they're medical professionals. They have licensing issues.  And I don't think it's appropriate to settle out a claim that potentially has an impact on an individual medical provider without the medical provider being present, or at least there's a heck of a waiver in place saying, you know, I consent.

So I would encourage you to maybe try to make a run at mediation to get it settled.  Again, I think it's not something you can just run in and do.  All the I's have to be dotted, the T's crossed, and all the Defendants need to be adequately represented.  Judge Yarbrough would be willing to make a run at it, but again, he does a lot of cases by consent as a Magistrate Judge, so his docket is pretty full.

MS. BLAKE:  Your Honor, may I address that issue?

THE COURT:  Sure.

MS. BLAKE:  I do want to inform the Court, and I have not discussed this with Plaintiffs' counsel, but I have made contact with Judge Yarbrough's office, and all the individual Defendants' counsel are aware and we have discussed just that, getting the matter before Judge Yarbrough.  We have also discussed other issues with Plaintiffs' counsel regarding a potential resolution of the case that would involve all the parties and all the Defendants.  So I just wanted to bring that to the Court's attention.

THE COURT:  I think that would be good, and that would make it easy for all concerned.  But again, if I have to decide it, I'll decide it, but it's not going to be something that's going to be done right away.  We've got the holidays coming up, I've got some other criminal trial settings, so it's not going to be something done within 30 days.  And then, you've got all these issues about all the in camera stuff that's got to be submitted.

In any event, why don't we take a short break.  You talk with your general counsel about who -- in other words, going forward, who's going to represent CorrHealth on this default issue.  Ms. Ah Loy?

MS. AH LOY:  I have a quick question for you.  As far as the in camera materials go, I do not have a privilege log right now.  I can have it to everyone today.  I do have printed materials.  What is your preference on how we get the in camera materials to you?  I can email them, I can --

THE COURT:  I'd say email.  And it doesn't have to be -- I have to be down in Las Cruces Thursday and Friday.  So in other words, if you were going to get it to us this afternoon, I'm not going to look at it this week.  I'm down in Las Cruces.

MS. BLAKE:  And speaking for myself, I'm not going to look at anything tonight, either.  None of the counsel will have an opportunity to do that this evening.

I do want to bring to the Court's attention, as you are well aware, Your Honor, not only do I have a relationship with general counsel for CorrHealth, I have a tri-part relationship with the carrier, as well.  So I need approval from the carrier.  I just can't make the representation about my representation of CorrHealth without some input from them.

THE COURT:  Fair enough.  We've got enough conflict issues, we don't want to get into anymore.

All right.  Let's take a break.

(Recess was held at 3:59 P.M.)

(In Open Court at 4:11 P.M.)

THE COURT:  Please be seated.

One thing quickly.  Let me just say, when we were talking about the Dunton issues, Mr. Leonard, you were the one that first flagged, I think, a potential issue, or you and other Plaintiffs' counsel.  So I commend you for at least flagging it initially.

All right.  So where are we now?

MS. BLAKE:  Your Honor, I spoke to the representative from Aspen Insurance Company and I've spoken to general counsel for CorrHealth, and I do have authority to represent to the Court that I will be representing and serving as counsel for CorrHealth moving forward.  My firm, Allen Law Firm, and myself.  So Plaintiffs can contact me with any questions moving forward in the future about the case.

THE COURT: Okay.

MS. AH LOY: With that, we would formally request approval from Your Honor to withdraw from our representation in this matter.

THE COURT: I'll approve the request.

MS. AH LOY: Thank you.

THE COURT: You had a motion on file, right?

MS. AH LOY: Yes, Your Honor.

THE COURT: If I just have a text order entered, is that sufficient?

MS. AH LOY: Yes. Our motion was just for the individual Defendants. We didn't move to withdraw for CorrHealth. Can we orally move to withdraw for CorrHealth and have a minute order?

THE COURT: Sure. Well, CorrHealth is not opposed, I take it?

MS. BLAKE: No, not at all.

THE COURT: All right. Then your firm, HBS, you will be relieved of any further responsibility in this case. I'm sorry I made you miss your anniversary. You'll have to make it up to your wife.

MR. HENDREN: Thank you, Your Honor.

MS. AH LOY: Thank you, Your Honor.

THE COURT: All right. Now, in terms of the representation going forward, are you just representing

CorrHealth?

MS. BLAKE:  Yes, Your Honor.

THE COURT:  So at this point, the individual Defendants, are they represented now by counsel?  Are you-all going to stay?

MR. BARNETT:  Yes, Your Honor.

THE COURT:  So if you could, run down the list and tell me who is representing each Defendant.

MR. BARNETT:  Chance Barnett on behalf of Dr. Bruce Boynton.

MR. SWEENEY:  Scott Sweeney on behalf of Kimberly Rich-Gainey.

MS. WILLIAMS:  Carla Williams on behalf of Oakley Blasdel.

MR. RAPPAPORT:  Matt Rappaport on behalf of Myra Martinez.

MS. BRENNAN:  And Christina Brennan on behalf of Barry Schooley-Stanford.

THE COURT:  Okay.  In terms of stating anything on the record, was there anything you-all wanted to state today? I neglected to ask.

MR. RAPPAPORT:  Your Honor, I'm reluctant to speak without being asked to speak.  However, Mr. Leonard today has asked for a default judgment against my client.

THE COURT:  Right.

MR. RAPPAPORT:  And I think we need to address that individually.

THE COURT:  I would agree.  I raised the issue in the very beginning.  I mean, I'm not -- in other words, I don't fault Plaintiffs for requesting the judgment, but the concern I have is, again, the conflict issues and the lack of notice.  So I guess there's going to have to be additional -- Mr. Leonard, did the initial Motion for Default Judgment, from your perspective, was it fully briefed initially on why default judgment should be entered against the individual Defendants?

MR. LEONARD:  We submitted some authority on that in argument, but I don't think that can be conclusively addressed in the existing briefing partly because of this issue of in camera submissions which affect what Mr. Kannenberg's communications were, what his side of the story was, at least with respect to the communications with the individual Defendants.  So as I said at the beginning, if you ask me what the substantive relief is, it may include up to a default judgment or lesser sanctions.

But then there's a separate procedural issue of, is there a sufficient record where these folks who are appearing today and just entered an appearance within the 14-day period they had for the Order to Show Cause to respond -- that was all the time they had to learn the case and file the brief.  I think before we get to a default judgment, there would be

additional process.

THE COURT:  I would agree.  So going forward, should I resolve the issues initially relating in the Order to Show Cause directed to Mr. Kannenberg and CorrHealth?  And then at that point, I suppose if Plaintiffs felt a default judgment against individual Defendants was appropriate, you could file it relating to the individual Defendants, and then the individual Defendants' attorneys can then respond.  Would that be the appropriate procedural way to go?

MR. LEONARD:  Yes, that would work for us, Your Honor.  And just in terms of it being late in the day today, in terms of trying to argue based on the limited record and understanding that I'm prejudiced or limited on my side, too, because I don't know these in camera submissions, and some of them haven't even been submitted on a privilege log yet, it would make sense to me to have Plaintiffs submit an additional brief and then the individual Defendants could respond.

But keeping in mind that it's not an issue that we created in the first place.  It just adds to the fees and the unfair prejudice.

THE COURT:  No, I understand the point you're making.

MR. LEONARD:  But in terms of the practicality, can we argue this today with five different individual Defendants at 4:15 in the afternoon?  I don't think that's going to be sufficient process for either side.

THE COURT:  I would agree with that.

MR. RAPPAPORT:  Your Honor, my understanding was procedurally, you asked all of us to be here to consider whether or not default judgment should be entered and/or sanctions against counsel, including the individual Defendants. At the outset of this hearing, you asked Mr. Leonard what he was seeking, and I'm simply here -- if we're going to be given the opportunity to respond, we're going to respond.  But if you're telling me now is not the time, I'll sit down.

THE COURT:  I would say for all counsel representing the individual Defendants, at this point in terms of what I am clear about, and this is based on what's been presented today and also the submissions from Hall Booth Smith, that there was a conflict where they could not -- I think they were trying, if we were going to trial on December the 3rd, they were trying to figure out how to deal with the situation and have a lawyer separately represent the individual Defendants.  So I appreciate that they had a contingency plan.  But at this point, there was a lack of -- even of the trial setting, there was a lack of notice to the individual Defendants.  And then in terms of what was of record before on the Dunton issues, there was not a Dunton problem.  That didn't surface until the Hall Booth Smith pleadings.

So at this point, I think it would be premature.  I would be shortcutting Plaintiffs' counsel in terms of trying to

make a case for sanctions against the individual Defendants, and then I'd be shortcutting, now that the individual Defendants have counsel in this case, I would really be putting you as well as the other lawyers for the individual Defendants in a real difficult situation.

So I think at this point, it would make sense -- I don't know if bifurcate is the right word, but I'm going to let the record get additionally supplemented as to Mr. Kannenberg and to Jackson Kelly and then CorrHealth, and then we'll deal with the individual Defendants.  And then, who knows.  Maybe we'll all get lucky and the case will get resolved.

I will say this, that I do believe, and I'm assuming that if there is a mediation, whether it is Judge Yarbrough or you use a private mediator, I'm assuming now that all the counsel for the individual Defendants, at a minimum, would be present for that mediation.

MR. RAPPAPORT:  Your assumption is 100 percent correct.

THE COURT:  Okay.  And again, those are the kind of things that I'll leave up to -- whoever is doing the mediation would decide whether the individual providers need to be there.  But at a minimum, they've got independent counsel now and independent counsel can look after their interests.

All right.  Then I guess that's all we need to do today, right?

MS. BLAKE:  I have a question, Your Honor, and it's just in terms of, for me, a clear road map.

I had previously requested leave from the Court to review the in camera presentations and respond accordingly, if necessary.  But I'm asking, I guess, formally if I could put that in the form of a reply to Plaintiffs' response to the Order to Show Cause, once I have an opportunity to review the in camera materials.  Or how would the Court like to proceed?

THE COURT:  Why don't you supplement the response.

MS. BLAKE:  Supplement my -- oh, okay.

THE COURT:  Yes, do that for CorrHealth, and then that way, Plaintiffs' counsel can then file a reply.

MS. BLAKE:  Perfect.

THE COURT:  But your response is not going to be -- I don't know if you-all want to work it out.  I think you obviously need to see and work it out.  Again, since a lot of this stuff being submitted for in camera is being done because of the attorney-client privilege of CorrHealth, I think since you are now CorrHealth's counsel going forward, I don't see an issue with you reviewing those materials.  Do you?

MS. SCHOFIELD:  No.  We are happy to provide, obviously, the communications with CorrHealth to their counsel. To the extent that we have in camera materials that address communications with the individual Defendants, we won't provide those to CorrHealth.

THE COURT:  And then I also should state, I don't find that there's any basis for any sanctionable conduct towards the HBS law firm.  So I don't know, do you-all still want to do an in camera submission?  I've granted your Motion to Withdraw, and as far as -- I mean, I don't know.  Are you asserting any claims at this point, Mr. Leonard?

MR. LEONARD:  Oh, we certainly are, yes.

THE COURT:  Against the HBS lawyers?

MR. LEONARD:  Yes.

THE COURT:  All right.  Well, then, I guess you need to --

MR. HENDREN:  What's the standing there?

MS. SCHOFIELD:  Thank you, Your Honor.

THE COURT:  All right.  Well, we'll see how it shakes out.

MR. HENDREN:  We'll see.

THE COURT:  Well, you're not -- you're relieved of any responsibility for further representation of Defendants.  I guess if they're requesting -- if Plaintiffs' counsel is requesting sanctions against your firm, then I guess you've got to respond.  So go ahead and submit whatever you wanted to submit for in camera review.

MS. SCHOFIELD:  And Your Honor, maybe if I could just have some clarification for that, as well, in terms of our -- because we do have some additional, now, in camera review.  By

what date would you like us to get that to you?  We will, of course, as we've done before, continue to privilege log it for Mr. Leonard.

THE COURT:  What's reasonable?

MS. SCHOFIELD:  I mean, I can get it to you tomorrow. Friday would be nicer.

THE COURT:  Either do it before Christmas or after the 1st.  If you can get it done by the end of next week, that would be fine.  That's by December the 20th.  Would that work?

MS. SCHOFIELD:  December 20th would work, Your Honor.  And also, I know we're at the end of a long day, but I was going to ask for some indulgence from you to briefly address a couple of issues that were raised during the cross-examination of Mr. Kannenberg.

THE COURT:  Sure, go ahead.

MS. SCHOFIELD:  Okay.  Thank you, Your Honor.

I first wanted to just make sure that it's clear that this question about the safety net representation and the dispute regarding that, that did not arise during the time that Mr. Kannenberg was representing the CorrHealth Defendants. That arose only after Mr. Kannenberg was terminated.  And while we agree that Hall Booth Smith needed to raise it to the Court because it was, in fact, a representation that had been made, it wasn't anything that Mr. Kannenberg -- because to this day,

Mr. Kannenberg can't tell you the nature of the dispute because he wasn't involved in those discussions.

Hall Booth Smith had indicated, Your Honor, Mr. Hendren when he was up here, that they were ready to proceed. They had evaluated the issue that had arisen regarding that representation. They believed it had been waived and they could proceed accordingly. The problem, then, of course, as Your Honor has noted, was that the individual Defendants didn't know about the trial setting. Therefore, much of it has focused today on the contact information.

Respectfully, Your Honor, we can submit a declaration from the partner at Jackson Kelly who prepared that file transfer. The contact information was there, and it was not, as has been represented to you, only their CorrHealth email addresses. It was personal email addresses, personal telephone numbers. The only person on the date when the contact information was submitted who was still at CorrHealth and then later left was Myra Martinez.

But then, also, as the briefing indicates, CorrHealth had the information. Hall Booth Smith says that's how they got it. There's no explanation provided, and perhaps it's because we can't know, Your Honor. But as of August 22nd, they're dismayed that they don't have the file. As of November 1st, they still haven't contacted the individual Defendants. And for some reason, they lay that on the foot of Mr. Kannenberg

because he was terminated.  And I know that they think maybe he wasn't, but you have the email communications, Your Honor, where it's very clear from the carrier's perspective, he was terminated.  The only thing he had the authority to do was try to move that trial setting.

THE COURT:  You're talking about the November trial setting?

MS. SCHOFIELD:  Correct.  Correct, and once it was moved to December, that was it.  He was done.  He was out.

Mr. Holland asked Mr. Kannenberg whether or not he engaged improperly, because he did reach out to his former clients once he was disqualified.  I'm not disciplinary counsel.  I'm not here to pass judgment on Mr. Holland.  But for his education, if he's interested in knowing, if other counsel had entered their appearance, or he knew that his clients were represented by other counsel, then, yes, he acted inappropriately.  If they were not represented --

THE COURT:  But is the local rule in conflict with the Rules of Professional Responsibility?

MS. SCHOFIELD:  The local rule in terms of?

THE COURT:  I mean, again, it comes back to, there's a real practical reason for that.  When a lawyer wants to withdraw, you determine the position, whether the client consents to it.  So at least if the client is going to end up being pro se, the clerk's office has an address or an email

address to give notices to.

MS. SCHOFIELD:  And it's not, Your Honor, because what we're talking about are two different situations.  In one case, which certainly is probably frankly the more common case, is that a lawyer terminates the representation, either because there's been a breakdown in the relationship, they haven't been paid.  Perhaps that's the most common.

THE COURT:  Sure.

MS. SCHOFIELD:  And in that case, what the Rules of Professional Conduct say is you need to give reasonable notice to your client.  You need to contact them.  You need to make sure, you know, do you consent to this.

If the client terminates the representation, well, then we're in a different situation, right, and that doesn't mean that the Court can't still say, notwithstanding that termination, you're on the hook for this trial because I have my docket to control.  And that could be very awkward, and the Court might -- but they can try to navigate that.

Luckily what we had in this situation, though, was, you're terminated, don't worry, we already have other counsel on board.  So there's not this weird gap.

THE COURT:  I'm still -- again, I recognize hindsight is 20/20.

MS. SCHOFIELD:  Sure.

THE COURT:  I'm still perplexed by why, at that

telephonic status conference in September, if Mr. Kannenberg and Jackson Kelly are on their way out, why wasn't that put on the record?

MS. SCHOFIELD:  And Your Honor, I appreciate what you're saying.  It could have been much more direct.  But I think what the understanding was, the Court might not let him withdraw.  And he is trying to advise the Court both in his written pleading and at the conference, look, other counsel is coming in.  Right?  And he says that, again, in both the written submission --

THE COURT:  The word is anticipated.

MS. SCHOFIELD:  It's anticipated.  Well, they haven't entered their appearance yet, so I mean, just like Mr. Kannenberg was terminated, perhaps Hall Booth Smith would have, you know, been terminated, as well.

THE COURT:  They didn't enter their appearance until, I think it was September the 30th.

MS. SCHOFIELD:  You'll have to ask them about that.

THE COURT:  It's on the docket.

MS. SCHOFIELD:  No, I know.  But I don't know why they did it -- you're correct, it was September 30th.  I just don't know why there was the delay.

THE COURT:  Right.  I'm looking at it from my perspective.  On September the 26th, there was a group of Plaintiffs' counsel and there was one lawyer who appeared at

that hearing on behalf of all Defendants.  That's what the transcript says.  And there's a reference to another law firm may come in.  There was also a representation that we're good to go for trial on December the 3rd.  So what other conclusion am I supposed to draw other than the fact that we're going to trial on December the 3rd?

MS. SCHOFIELD:  And I think what Your Honor heard was that was the expectation of Mr. Kannenberg and it was the expectation of Hall Booth Smith.  They approved that filing.  They were involved in the drafting of that filing, and they were provided it afterwards.  And it was the expectation of everybody that, in fact, just like Your Honor had expected, they were going to go to trial on December 3rd.

THE COURT:  Right.  But then the lawyers -- when you're faced with a conflict of interest situation, you've got to deal with that.

MS. SCHOFIELD:  Certainly, Your Honor.  And again, what I want to make sure is that there's two separate issues here.  The conflict that came up, which we don't know exactly how or why that came up -- and I suspect, Your Honor, that what the pleadings show is that was sort of in progress.  Nobody can be critical of Hall Booth Smith for trying to bring it up as soon as possible, because what they originally told this Court was it was inaccurate and unauthorized.  It's a much more nuanced approach that they're taking right now, and I suspect

that's because additional information was learned between the time that they first raised the issue and now.  And again, that's completely reasonable.

But what it tells us is that the information was being learned after Mr. Kannenberg was gone.  Even Hall Booth Smith who says they might not have been sure what his role was at the beginning, although the carrier was very clear with Mr. Kannenberg and confirmed it in writing what his role was, we know that that is in flux, because we can look at what Hall Booth Smith said in mid November and what they're saying now, and it's a different thing.  And again, I'm not saying that they're misrepresenting it, I'm saying they're learning additional information about this conflict.  They're evaluating it as they go.

What I really want to emphasize for the Court is all of that is happening without Mr. Kannenberg's involvement.  Not one person called Mr. Kannenberg to say, what do you think about this?  What were your communications?  Can you provide us some clarity?  And again, maybe that's appropriate that they're not involving Mr. Kannenberg since he's out, but certainly Mr. Kannenberg can't speak, then, to what happened after he was gone.  So I think what --

THE COURT:  Right, but there's an issue about when was he actually gone.  Was he gone in August when CorrHealth says, you know, we don't want you representing us?  Because

he's still representing the Defendants.  He's still counsel of record.

MS. SCHOFIELD:  Certainly, Your Honor.

THE COURT:  He's the only -- you know, Jackson Kelly and Mr. Kannenberg, they're counsel of record in this case.  They certainly were in September, and there wasn't any indication in terms of notice to me as the presiding Judge until an entry of appearance and then a Motion to Withdraw.

MS. SCHOFIELD:  And you're absolutely right, Your Honor.  And there was no appearance to Mr. Kannenberg, either.  September 30th, three days later, Hall Booth Smith enters their appearance.  According to what they told you today, we're ready to proceed, we've evaluated this issue, we've waived it, everything is ready to go until it isn't.

But what we do know from Hall Booth Smith is it wasn't just this matter, Your Honor, of when was Mr. Kannenberg officially terminated.  You can look at those exhibits.  Again, it was confirmed in writing.  If there was some misunderstanding on the part of the carrier and what they represented to Hall Booth Smith, again, that's not attributable to Mr. Kannenberg or Jackson Kelly.

But we know that there was some litigation activity going on.  Hall Booth Smith tells you, Your Honor, that they started negotiating with the Plaintiffs, that they were involved in that.  They did not involve Mr. Kannenberg in that.

He had no idea that was going on.  If they really thought he was still involved, you'd think they would have been looping him in.  Especially because what they tell this Court is, we promised the Plaintiffs that we weren't going to bill for a period of time because this may or may not be an eroding policy.

But they don't tell Mr. Kannenberg that.  So if the expectation was, well, maybe Mr. Kannenberg is just gearing up, getting ready for trial, well, somebody would have told him that and said no, no, no, don't do that, we've made a representation and you can't do that.  But they don't do that, and that's because Mr. Kannenberg isn't involved.  By the time they enter their appearance, as far as he knows, this is on track.  They've worked with him, they've secured the dates, this is going to go to trial.  Nobody contacts him, nobody says anything different.  November 5th, they say, can you get your withdrawal on file today?  He does that, and it makes sense to him because he's been terminated.

Certainly Hall Booth Smith didn't have the authority to terminate him.  If they had just decided, as they seem to represent, that they were going to terminate him, they don't have that authority.  That belongs to their client or their client's agent.  But they can make that request, because that had already been expressed to Mr. Kannenberg.  The fact that he was terminated, he didn't -- this wasn't a request coming from

Hall Booth Smith, it was just simply the finalization of a termination that had started earlier.  And so he goes ahead and does that.

Then on November 12th, things definitely fall off the tracks, Your Honor.  That's when this issue was raised and it seems like it's being evaluated, and Your Honor will have an opportunity to review some of the in camera material on that.  But none of that involved Mr. Kannenberg.

I do also -- because there were questions asked about mediation, I just want to make sure that it's clear we're talking about an insurance defense case where it can be, depending on the policy limits -- and I am not purporting to be coverage counsel, and I don't think anybody in this room should purport to be coverage counsel.  But it can settle without the involvement of the insureds.  It depends on the policy.  Sometimes there might be one insured that has to consent, sometimes there might be one more.

Hall Booth Smith tried to make a big point out of the fact that Mr. Kannenberg didn't invite the other Defendants to mediation.  They tell this Court, we were involved in the settlement negotiations.  We've never even spoken to the individual Defendants, but we're trying to negotiate on their behalf.  I'm not suggesting that's improper, I'm suggesting it depends on the policy.  It depends on what the carrier says they have authority to do.

Martinez, et al. vs. CorrHealth, et al.          12/10/2024
Order to Show Cause Hearing                       22-CV-288

It was probably completely appropriate for them to try to engage in settlement discussions even though they've never spoken to the majority of their clients, just as it was appropriate for Mr. Kannenberg, who had spoken to his clients -- and you'll have an opportunity to read some more about his privileged communications with them -- to attend mediation and to attend a continuation of that mediation. It just seems a little disingenuous to assert that what they did was proper and what Mr. Kannenberg did was not when, in fact, it just depends on the policy, and it was probably that both were proper procedures.

In short, Your Honor, I appreciate that Your Honor has questions, and perhaps, you know, maybe Mr. Kannenberg could have said something more forcefully, but what he did try to do, at all times, was proceed in good faith. The case was ready to go to trial, he was terminated, he worked with Hall Booth Smith -- I don't know if I mentioned it, but we'll get a declaration from Jackson Kelly. Everything that we've talked about today was in that file.

I don't know why -- and there's reference in their briefing. Like, oh, the consent communication. That was an email, Your Honor. The client communicated, that was an email. So they say they haven't received emails, but then they reference the contents of emails, they get up here and discuss the contents of emails. So respectfully, Your Honor, we'll get

that declaration to you, but they had the file materials.  Even if they didn't, they clearly had other ways to reach out.

From Mr. Kannenberg's perspective, he is doing exactly what he needs to do, and he's trying to balance these competing interests.  I've been fired by the carrier, new counsel has already come in, I'm going to work with them, I'm going to work with the Court, I'm going to work with Mr. Leonard, I'm going to try to keep this all going, right, because this case is ready to go to trial, and that's what he does.  And then without anybody talking to him, without anybody discussing what he knows, what the privileged in camera material will show is suddenly in mid November, there's this accusation that he said something that was unauthorized.

Although they don't expressly say they withdraw that accusation, that is implicitly what they've done, Your Honor. They've said, okay, it wasn't exactly like that.  Maybe it was authorized, but there's more to the story.  I wish that is what had been said in November, but again, I appreciate that they're trying to figure it out as they go, which is what Mr. Kannenberg was trying to do.  He was trying to navigate this and act in good faith and trying his best not to disrupt this Court's proceedings, and it's unfortunate that we're here today because that is what has happened.

But Your Honor, I would ask that you not award sanctions against Mr. Kannenberg or Jackson Kelly.  They take

this matter very seriously. You heard Mr. Kannenberg tell you that he's reported this. I mean, yes, he did try to use his best professional judgment. If there's concerns about what he's done, he wants somebody else to take a look at it. But I would ask that there not be sanctions awarded against either Jackson Kelly or Mr. Kannenberg, Your Honor.

MR. LEONARD: I have just one, or actually, a couple of little housekeeping matters.

THE COURT: Sure.

MR. LEONARD: We haven't had, on the Plaintiffs' side, we haven't had a chance to really argue the case, and I understand it's the same way for some of the individual Defendants. So again, due to the time constraints, I'm not going to try and do that now.

But just in terms of a road map for what we're doing next, I think the first thing is the submission of the materials for in camera review. And I tried to make a record that, yes, the Court needs to review those, but that doesn't mean that we're waiving our request to see those materials. We would argue that there was a waiver of the privilege even if there should be redacted documents that may be, you know, producible, even if some of the material is privileged and unrelated to the issue. So I just wanted to make clear that we're asking to see that.

We understand when there's a privilege log and

there's an in camera submission, the Court has to review that and then you can decide what Plaintiffs get to see, but we are requesting that material.

And we just can't emphasize enough the degree of unfair prejudice if we're now talking -- and also, we're not talking about the efficacy of lesser sanctions, we're talking about the efficacy of any sanctions if we don't even know when we're going to be able to get a trial date again.  And meanwhile, we're running up fees to have the trial of the HBS firm versus the Jackson Kelly firm.  We agree there's some culpability for both firms, and maybe the Sharuzi firm, as well.

But we were coming into the hearing today hoping that we could request a trial date of March, April, May, and part of the reason for that is, we rescheduled another trial for January.  That one also had a last-minute continuance.  We had one in October and one in December, both continued by last-minute withdrawals from counsel, and we couldn't reschedule the other one for December because we had rescheduled this one for December.  Now we have the other case for January, and so then we can't do this one until March.

THE COURT:  Oh, I understand your frustration on that.  Like I said, my goal was to have this case tried last week, possibly spilling over into the beginning of this week.  But that didn't happen.

Martinez, et al. vs. CorrHealth, et al.        12/10/2024
Order to Show Cause Hearing                     22-CV-288

MR. LEONARD:  So if there's a way to mitigate that prejudice while we're going to have to brief out these other issues, again, for which Plaintiff isn't being compensated and has no trial date in sight, you know, there couldn't be greater unfair prejudice, or what is any sanction that we could do if we still have to do a trial on damages.  So if there's a way to do an interim fee award, perhaps, while we're sorting this out, those are all things that I don't -- I'll stop there, because I don't want to -- I realize we need to just brief some other things and it's late in the day.  But I just wanted to emphasize those points.

And I think now that I know who counsel is for each Defendant, we can talk about if there's issues of, you know, what's the briefing schedule for this, or when are we turning in that.  I think the first stage is, of course, them turning in their privilege logs and their in camera submissions, and that's probably something we can work out if there's an issue of, okay, what do we do next.  You know, who files what brief when.  So just in terms of road map for where we go next, I just wanted to address those issues.

MR. RUYLE:  Judge, may I be heard?

THE COURT:  Sure.

MR. RUYLE:  Sam Ruyle on behalf of the Erickson kids. Their old man passed away in 2019.  This thing has been dragging on.  We got a trial date in August, and whatever

happened over here, I don't know, but some kind of machination that derailed this trial.  And we have been -- you know, these kids are looking for some kind of closure.  You've got 12 lawyers in the room, and we're never going to get that done, Judge.  So we'd ask for the Court to consider that.

THE COURT:  Well, that's what I was trying to indicate.  Again, the delay works more of a hardship, and I acknowledge that, it works more of a hardship on the Plaintiffs than it does the Defendants.  So I'm mindful of that.

MR. RUYLE:  I appreciate that, Judge.

THE COURT:  Did Hall Booth Smith want to say anything, or are you going to cover it in your submission?

MR. HENDREN:  Not to belabor the point, Your Honor, and you will get these materials in camera, but I would direct your attention to the November 1st, 2024, emails where we emailed Casey at 9:32 that morning:

"Casey, the file you sent us on this matter does not appear to be complete.  There are discovery documents missing. Some of the jail video appears to be missing.  Additionally, the file your office sent us does not appear to have contained the current contact information for the individually named CorrHealth Defendants.  Can you please forward their contact information as soon as possible?  We also need the complete file today, but no later than Monday, so we can prepare for trial.  Time is of the essence."

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                              22-CV-288

At 3:52 that afternoon, he responded and said: "Allie, as for contact information, I coordinated all deps and individual provider meetings through Mary Zold, CorrHealth Director," and it goes on from there.  And he says they would be the ones, the first ones to contact.

He then says to Tami, who you've heard about before: "Are there any other emails, phone numbers in the file for the individual provider Defendants?  I would still go through Mary and Tim at CorrHealth, whose contact information is below," which is correct.  Then he goes on to ask Tami about emails from the Sharuzi firm.

The point being, this representation that they had sent us this contact information is just simply not true, and it's shown by these emails.  He's saying, you know, let's find out if there's some more, and I still think you should go through CorrHealth.

So I get it that they're trying very hard to share what happened here with us, but -- and I've got more that I can show you on what we were doing during October and November to try to get this thing ready.  But it was in no way trying to mess this Court up, and I just want you to know that.  And we'll be happy to brief it further if you'd like us to.

THE COURT:  Okay.  Are we ready to adjourn?

MR. HENDREN:  We are.

THE COURT:  All right.  You all enjoy your holidays.

Martinez, et al. vs. CorrHealth, et al.                12/10/2024
Order to Show Cause Hearing                             22-CV-288

We'll be in recess.

(Proceedings adjourned at 4:47 P.M.)

* * * * *

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____
                               )
KRISTINA MARTINEZ, as Personal )
Representative of the ESTATE   )
OF DALE RAND ERICKSON,         )   No. 1:22-CV-00288-WJ-SCY
deceased, et al.,              )
                               )
            Plaintiffs,        )
                               )
      vs.                      )   ORDER TO SHOW CAUSE HEARING
                               )
CORRHEALTH, PROFESSIONAL       )
LIMITED LIABILITY COMPANY      )
d/b/a CORRHEALTH, LLC., et al. )
                               )
            Defendants.        )
_____)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal Realtime Official Court Reporter, in and for the United States District Court for the District of New Mexico, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter on Tuesday, December 10, 2024, and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States. Dated this 8th day of January, 2025.

_____
MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
Phone:  (505)348-2334